# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 14 2017, 9:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

A. David Hutson
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Casey Myers, *Appellant-Defendant,* | November 14, 2017 |
| v. | Court of Appeals Case No. 19A04-1704-CR-834 |
| | Appeal from the Dubois Circuit Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable Nathan A. Verkamp, Judge |
| | The Honorable Mark R. McConnell, Special Judge |
| | Trial Court Cause No. 19C01-1512-F1-1973 |

**Altice, Judge.**

## Case Summary

Casey Myers appeals following his convictions for Level 1 felony attempted murder, Level 6 felony strangulation, two counts of Level 6 felony intimidation, and Class A misdemeanor domestic battery. Myers raises the following issues for our review:

> 1. Did Myers knowingly and voluntarily waive his right to be present during the State's case-in-chief by repeatedly refusing to leave his jail cell to attend court proceedings?

> 2. Did the trial court abuse its discretion by admitting into evidence two phone calls, one of which Myers made a year before the offenses in this case and the other he made several months after the offenses?

> 3. Is Myers's forty-two-year aggregate sentence inappropriate in light of the nature of the offense and Myers's character?

We affirm.

## Facts & Procedural History

Myers and Kristen Myers (Kristen) met in 2011 and were married in 2012. They had a daughter together, and Kristen also had two older children from a previous marriage. Myers and Kristen had a contentious relationship, arguing frequently about Myers's drinking and his accusations that Kristen had been unfaithful. Myers and Kristen separated in July 2014.

[4] During the separation, Kristen became engaged to another man and obtained a protective order against Myers. When Myers learned of the engagement on December 7, 2014, he made a threatening phone call to Kristen in violation of the protective order. Kristen recorded the call, in which Myers told Kristen that if she wore her engagement ring anywhere near him, he would "fucking choke [her] in [his] kitchen. That shit is not gonna happen." *Exhibit Volume*, State's Ex. 87 at 2-3. Myers went on to tell Kristen, "You're gonna fucking die on my kitchen floor or you're gonna get over this bullshit. That's it. There is no in between. I'm not playing games no more. You will die and he will die, or you will fucking get over it. I'm not playing no more." *Id.* at 4.

[5] Myers and Kristen were divorced in February 2015, but they had reconciled by April 2015. One of Kristen's conditions for moving back in was that Myers stop drinking. Within a few months, however, Myers had started drinking again and become verbally abusive. When Kristen came home from her third-shift job on the morning of December 19, 2015, Myers accused her of cheating on him. Later that day, Myers came home from work drunk. Myers and Kristen got into a huge fight, and Kristen told him that she was leaving and called her mother to come pick her and the children up. During the phone call, Myers was heard yelling that Kristen would not leave the house alive. Eventually, Kristen's uncle came and picked her and the children up and took them to Kristen's mother's house.

[6] During the evening of December 19 and into the morning of December 20, Myers sent Kristen numerous text messages. In many of the messages, Myers

expressed anger over the fact that Kristen had changed her Facebook status to single. Myers accused Kristen of cheating, called her derogatory names, and generally expressed great hostility toward her.

[7] On December 21, 2015, Kristen and her friend, Rachel Smitson, went back to the house to retrieve Kristen's and her children's personal property and the children's Christmas presents. Myers had been drinking and started arguing with Kristen immediately. When Kristen threatened to call the police, Myers said "I'll kill you then I'll kill her," referring to Smitson. *Transcript Vol. V* at 60. While Kristen was in the bedroom gathering her belongings, Myers told her "you're going to fucking die." *Id.* at 18. Myers then grabbed Kristen by the throat, slammed her down onto the bed, and started choking her and punching her in the face. Smitson started screaming and hitting and biting Myers, but he would not let Kristen go. Smitson fled the house and called 911 while running across the street to get the address of the Myers home from a neighbor. Smitson tried to re-enter the house, but the door had been locked.

[8] Meanwhile, Myers choked Kristen into unconsciousness before retrieving a knife. Myers then slashed Kristen's throat, creating a six- to seven-inch laceration and coming within millimeters of completely severing her trachea. Myers also stabbed Kristen in the back and shoulder where she had tattoos of her children's names. Myers then came out onto the front porch with a beer and a cigarette in his hand and said "I'm done. She's dead." *Id.* at 64.

[9]     When police arrived, Kristen was alive but writhing in pain, in and out of consciousness, and breathing through the hole in her neck. Police called for an ambulance, and Myers was immediately placed in handcuffs. Myers repeatedly told officers that he had ruined his life and asked to be taken to a police car because he did not want to see Kristen being taken out of the house by EMTs. When Myers was eventually escorted to a police car, he refused to walk and had to be dragged by two officers. When placed in a holding cell at the jail, Myers began banging his head against the concrete wall and had to be dragged out of the cell.

[10]    Because Kristen's trachea remained attached by only a small amount of tissue at the back, paramedics could not risk intubating her at the scene for fear of ripping the trachea the rest of the way, which would have been fatal. Kristen was rushed to the hospital, where she had to be sedated and paralyzed before she could be intubated. Several medical personnel testified that they had never seen an injury like Kristen's on a person who was still alive. Kristen underwent life-saving surgery, but to this day she continues to have difficulty swallowing and chokes easily, and she also suffers from post-traumatic stress disorder.

[11]    As a result of these events, the State charged Myers with attempted murder, strangulation, two counts of intimidation, and domestic battery. While incarcerated pending trial, Myers called his mother on August 9, 2016. In that call, Myers told his mother that he had caught Kristen cheating on him before the attack and that Kristen was now lying about when her new relationship had begun.

[12] Myers's jury trial took place from February 21 through March 1, 2017. Myers was present in court during jury selection. However, the next day, when the presentation of evidence was scheduled to begin, Myers refused to come to court. The trial court noted that jail personnel had stated that Myers did not wish to be present. Over defense counsel's objection, the court proceeded with trial and admonished the jury that Myers was not required to be present and that his absence should not be considered by the jury. At the court's instruction, jail personnel asked Myers twice a day, once in the morning and once at lunch, whether he had changed his mind and wanted to go to court. Each time, Myers refused. After the State rested, the trial court had Myers escorted to the courtroom to inquire whether Myers intended to testify on his own behalf. Myers indicated that he wanted to testify and he was present for the rest of the trial.

[13] At the conclusion of the evidence, the jury found Myers guilty as charged. The trial court imposed a forty-year sentence for attempted murder, two-year sentences on each of the three Level 6 felony convictions, and a one-year sentence on the misdemeanor domestic battery conviction. The court ran all sentences concurrently, except for the intimidation count in which Smitson was the victim, which was to run consecutive to the forty-year sentence for attempted murder. As a result, Myers received an aggregate sentence of forty-two years. Myers now appeals.

## 1. Presence at Trial

[14]  Myers first argues that he did not knowingly and voluntarily waive his right to be present at trial. As our Supreme Court has explained:

> Generally, a criminal defendant has a right to be present at all stages of the trial. *Lampkins v. State*, 682 N.E.2d 1268, 1273 (Ind. 1997). However, a defendant may waive this right and be tried in absentia if the trial court determines that the defendant knowingly and voluntarily waived that right. *Id.* The trial court may presume a defendant voluntarily, knowingly and intelligently waived his right to be present and try the defendant in absentia upon a showing that the defendant knew the scheduled trial date but failed to appear. *Ellis v. State*, 525 N.E.2d 610, 611–12 (Ind. Ct. App. 1987). The best evidence of this knowledge is the defendant's presence in court on the day the matter is set for trial. *Fennell v. State*, 492 N.E.2d 297, 299 (Ind. 1986).

*Soliz v. State*, 832 N.E.2d 1022, 1029 (Ind. Ct. App. 2005), *trans. denied*. *See also Carter v. State*, 501 N.E.2d 439, 440 (Ind. 1986) ("The continued absence of a defendant who knows of his obligation to be in court, when coupled with a failure to notify the court and provide it with an explanation, constitutes a knowing and voluntary waiver."). It is beyond question that a defendant may not frustrate the orderly and efficient disposition of the charges against him by simply refusing to come to court. *See Taylor v. United States*, 414 U.S. 17 (1973) ("there can be no doubt whatever that the governmental prerogative to proceed with a trial may not be defeated by conduct of the accused that prevents the trial from going forward" (quoting *Illinois v. Allen*, 397 U.S. 337, 349 (1970)); *Broecker v. State*, 342 N.E.2d 886, 888 (Ind. Ct. App. 1976) (explaining that "the deliberate absence of a defendant who knows that he stands accused in a

criminal case and that the trial will begin on a day certain indicates nothing less than an intention to obstruct the orderly processes of justice").

[15] In this case, Myers was in custody and chose to be present for jury selection, but he refused to appear the next day when the presentation of evidence was scheduled to commence. At the trial court's direction, jail personnel asked Myers two times per day if he had changed his mind and wished to appear for trial after all. Myers steadfastly refused to attend until after the State rested and the trial court summoned him to determine whether he wished to testify. Under these circumstances, it strains credulity to suggest that Myers was unaware of his right to be present during the proceedings.[1] *Cf. Taylor*, 414 U.S. at 20 (finding it "wholly incredible" to suggest that a defendant who was free on bail and had attended the opening session of his trial had any doubts concerning his right to be present).

[16] When Myers finally appeared in court after the State rested, the following exchange occurred on the record:

> THE COURT: . . . I know that you were present here on the first day of trial during the voir dire process, and I have been advised by the sheriff's department that on each day since that time that you have been asked in the morning and after lunch if

---

[1] We also note that this was not the first time Myers had chosen to absent himself from the proceedings. Myers had also chosen not to attend a pretrial hearing. Additionally, Myers had apparently indicated in advance of trial that he might refuse to attend. Indeed, because Myers had given "some indication in the past that [he] might not appear," the court had already prepared and distributed to the parties an admonishment explaining to the jury that it was not to consider Myers's absence from trial in determining his guilt or innocence. *Transcript Volume III* at 25.

you wish to appear in court, and I've been told that on each occasion that you have declined the opportunity to be present in court. Is that correct, sir?

THE DEFENDANT: Yes, sir.

. . .

THE DEFENDANT: Well, I feel like I need to say something so that all of you in here know that it's not because I'm disrespectful and I think this is just a joke because I don't think that. I was under the impression that if I didn't sign a plea agreement that it was going to make you mad, and I was going to get maxed out regardless of what happened at trial. It could've been a misunderstanding between me and my lawyer, but that's what I got out of it.

And I also was told that I was going to be able to discuss nothing that has happened between her and I except for the night of this incident, and I feel like everything that's led up to the night of this incident is why this incident happened, not just the night that it happened. So I just felt like I had no chance of actually defending myself.

*Transcript Vol. V* at 139, 143.

[17]    In other words, Myers confirmed that he knowingly and voluntarily chose not to attend his trial because he believed the proceedings would be unfair to him. Although Myers's choice may have been a misguided one, it is not necessary to prove that a defendant's decision was wise, prudent, or the product of sound strategic decision-making. As wrongheaded as Myers's excuses may have been,

they demonstrate that he was aware that his trial was underway and that he could attend if he so chose.

[18] Finally, we take exception to the suggestion that the trial court was required to take special steps to accommodate Myers's refusal to come to court. That is, Myers argues that the trial court should have either forced him to appear in court against his will or conducted proceedings by phone or in the jail in order to make a record of what was already clear—that Myers knew his trial was underway and was choosing not to attend. The fact that trial courts in other cases may have taken such steps in no way establishes that courts are required to do so every time an incarcerated defendant refuses to leave his cell, and we cannot agree with Myers's assertion that such processes would interfere minimally with the conduct of a trial. *See People v. Gutierrez*, 63 P.3d 1000, 1008 (Cal. 2003) (reasoning that "a bailiff could drag an unwilling and uncooperative defendant out of the lockup to the courtroom, but doing so would expose the bailiff and others, including the defendant, to bodily injury" and that "forcing a trial judge to leave the bench each time a defendant did not want to leave the lockup would greatly 'frustrat[e] the orderly processes' of court proceedings" (citation omitted)). Such an approach would only encourage contumacious defendants to engage in dilatory and obstructive tactics.[2] Under the facts and

---

[2] We must also note that, contrary to the dissent's assertion, the State does not claim that Myers had to be forcibly dragged into the courtroom. Rather, the State argues that accepting a rule that any waiver of an incarcerated defendant's right to be present must be made expressly and in person would have the unfortunate result of creating situations in which jail personnel would be required to use force to bring recalcitrant defendants to court, posing safety risks to all involved.

circumstances presented here, there is no question that Myers knowingly and voluntarily waived his right to be present during the State's case-in-chief.

## 2. Admission of Telephone Calls

[19] Next, Myers argues that the trial court abused its discretion in admitting his December 2014 threatening phone call to Kristen and his August 2016 jail phone call to his mother. Trial courts are afforded wide discretion in ruling on the admissibility of evidence, and our review of such decisions is limited to determining whether the court abused that discretion. *Beasley v. State*, 46 N.E.2d 1232, 1235 (Ind. 2016). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id.* In considering whether a trial court has abused its discretion in the admission or exclusion of evidence, we do not reweigh the evidence. *Id.* We consider only the evidence favorable to the ruling and any unrefuted evidence favorable to the defendant. *Id.*

[20] With respect to the 2014 phone call to Kristen, Myers argues that the evidence was inadmissible pursuant to Ind. Evidence Rule 404(b). Evid. R. 404(b)(1) prohibits evidence of "a crime, wrong, or other act" of the defendant when used as character evidence to show that on a particular occasion he acted in accordance with that character. *Baker v. State*, 997 N.E.2d 67, 70 (Ind. Ct. App. 2013). Such evidence, however, may be admissible for other purposes unrelated to propensity. *See* Evid. R. 404(b)(2); *Baker*, 997 N.E.2d at 70.

"Numerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime." *Iqbal v. State*, 805 N.E.2d 401, 408 (Ind. Ct. App. 2004), *trans. denied*. In assessing the admissibility of evidence under Evid. R. 404(b), the trial court must: (1) determine whether the evidence of a crime, wrong, or other act is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect. *Baker*, 997 N.E.2d at 70.

[21] Myers argues that because the phone call occurred a year before the offenses in this case and the parties subsequently reconciled, the call is not probative of his motive on December 21, 2015. We cannot agree. As our Supreme Court has noted, remoteness in time does not render 404(b) evidence per se inadmissible; "[r]ather, the timing and similarity of the incidents are factors in the larger inquiry into whether the incidents were relevant to a matter in issue." *Hicks v. State*, 690 N.E.2d 215, 222 (Ind. 1997) (finding no error in the admission of evidence at the defendant's murder trial that he had beaten the victim more than three years earlier). The threats Myers made in the 2014 phone call were highly probative of the nature of his relationship with Kristen and his motive in this case. The threats were made against the same victim and under very similar circumstances—i.e., Myers believed that Kristen was leaving him for

another man.[3]  Moreover, the specific threats Myers made were very similar to the acts he eventually carried out in December 2015.  He told Kristen that he would "fucking choke [her] in [his] kitchen" and that she was "gonna fucking die on [his] kitchen floor[.]" *Exhibit Volume*, State's Ex. 87 at 2-4.  In this case, Myers choked Kristen and attempted to murder her by slashing her throat; the only real dissimilarity between his threats and his eventual acts is that Myers carried out the attack in the bedroom rather than the kitchen.

[22]  Myers also argues that the 2014 phone call was unfairly prejudicial because it contained foul and offensive language, which Myers asserts "could have inflamed the jurors' passions against Myers on grounds having nothing to do with the incident at issue." *Appellant's Brief* at 26.  We note, however, that Myers did not request that the statements be redacted to remove such language.  In any event, Myers's language was relevant to demonstrate the depth of his hostility toward Kristen, and it was not so graphic as to pose any real risk that the jury would choose to convict him on an improper basis.  *See Williams v. State*, 891 N.E.2d 621, 630 (Ind. Ct. App. 2008) (explaining that "[u]nfair prejudice addresses the way in which the jury is expected to respond to the evidence; it looks to the capacity of the evidence to persuade by illegitimate

---

[3] It is on this basis that *Steinberg v. State*, 941 N.E.2d 515 (Ind. Ct. App. 2011), *trans. denied*, on which Myers relies, is most clearly distinguishable.  In that case, another panel of this court found error (albeit harmless) in the admission of evidence that the defendant had, over a year prior to the charged murder, sent an email to "what appear[ed] to be a United Kingdom governmental law commission" asking about the applicability of defenses to murder, such as "fear of personal harm." *Id.* at 527.  No evidence was presented to establish any connection between the challenged evidence and the "apparently random and motiveless killing" the defendant subsequently committed. *Id.*

means, or the tendency of the evidence to suggest decision on an improper basis" (citation and internal quotations omitted)). The trial court did not abuse its discretion in admitting the 2014 phone call into evidence.

[23] Myers next argues that the trial court abused its discretion in admitting the 2016 jail phone call to his mother into evidence, arguing that the call was irrelevant and unfairly prejudicial. Myers has not preserved this issue. Although Myers argued against the admissibility of the jail call at a pretrial hearing, when the State offered the call into evidence, Myers's counsel affirmatively stated that he had "no objections." *Transcript Vol. IV* at 11. Myers's appellate argument concerning the admission of the call is therefore waived. *See Hayworth v. State*, 904 N.E.2d 684, 692-94 (by affirmatively stating "no objection," the defendant waived any issue concerning the admission of the evidence).

[24] Waiver notwithstanding, we find no error in the admission of the jail phone call. In the call, Myers told his mother that Kristen had left because he had caught her cheating on him with someone she knew from work and that she was lying about when this relationship began. This evidence was relevant to Myers's motive for attacking Kristen, and it was also relevant to whether he was acting under sudden heat so as to support a conviction for the lesser offense of attempted voluntary manslaughter, on which Myers successfully sought a jury instruction. Furthermore, although Myers briefly spoke of unrelated things and used some offensive and crude language during the call, the content is not so damaging as to compel a conclusion that the probative value of the call was substantially outweighed by the risk of unfair prejudice. *See Snow v. State*, 77

N.E.3d 173, 176-77 (Ind. 2017) (explaining that "[a] trial court's discretion is wide on issues of relevance and unfair prejudice" and such determinations can often be resolved either way"). Myers has not established reversible error on this basis.

### 3. Sentencing

[25] Finally, Myers argues that his forty-two-year aggregate sentence is inappropriate. Article 7, section 4 of the Indiana Constitution grants our Supreme Court the power to review and revise criminal sentences. *See Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014), *cert. denied*, 135 S.Ct. 978 (2015). Pursuant to Ind. Appellate Rule 7, the Supreme Court authorized this court to perform the same task. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). Per App. R. 7(B), we may revise a sentence "if after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014) (quoting App. R. 7). "Sentencing review under Appellate Rule 7(B) is very deferential to the trial court." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[26] The determination of whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Bethea v. State*, 983 N.E.2d 1134, 1145 (Ind. 2013) (quoting *Cardwell*, 895 N.E.2d at 1224). Moreover, "[t]he principal role of such review is to attempt to leaven the outliers." *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013). It is not our goal in this endeavor to achieve the perceived "correct" sentence in each case. *Knapp*, 9 N.E.3d at 1292. Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original).

[27] In order to assess the appropriateness of a sentence, we first look to the statutory range established for the classification of the relevant offenses. Myers was convicted of a Level 1 felony, three Level 6 felonies, and a Class A misdemeanor. The sentencing range for a Level 1 felony is twenty to forty years, with an advisory sentence of thirty years. The sentencing range for a Level 6 felony is six months to two-and-a-half years, with an advisory sentence of one year. Finally, the maximum sentence for a Class A misdemeanor is one year. Myers received the maximum sentence of forty years for Level 1 felony attempted murder, two-year sentences on each Level 6 felony convictions, and the maximum one-year sentence for Class A misdemeanor domestic battery. The court ran all sentences concurrently, except for the Level 6 felony intimidation count in which Smitson was the victim, which the court ordered to

run consecutive to the sentence for attempted murder. As a result, Myers received an aggregate sentence of forty-two years.

[28] The nature of the offenses in this case is horrific and sufficient standing alone to justify the sentence imposed. Myers threatened to kill both Kristen and Smitson before brutally attacking Kristen. He punched Kristen in the face, fracturing her orbital, and choked her into unconsciousness. While Kristen lay helpless on the floor, Myers got up and locked the front door and retrieved a knife. He slashed Kristen's throat and stabbed her in the back and shoulder where she had tattoos of her children's names. Apparently believing he had succeeded in killing Kristen, Myers grabbed a beer and a cigarette before heading out onto his porch to tell Smitson that he was done and Kristen was dead. Myers's actions were chillingly similar to the threats he had made approximately a year earlier. Medical personnel testified that Kristen's injuries were the worst they had ever seen on a living patient, and that Myers had come within millimeters of completely severing Kristen's trachea, which would have caused her to suffocate. As a result of the attack, Kristen had a feeding tube in her abdomen for seven weeks, causing her weight to drop to ninety-eight pounds. She had to spend Christmas in the hospital, and her ten-year-old daughter had to help care for her upon her release. Kristen testified that she continues to have difficulty swallowing and chokes often, and that she suffers from PTSD and has nightmares as a result of the attack. Nothing about the nature of the offense would justify appellate sentence revision.

[29] Myers's character also provides ample justification for the sentence imposed. Myers's criminal history includes convictions for felony intimidation and misdemeanor criminal mischief, and Kristen was the victim of both of those offenses. Myers was on probation when he committed the crimes in this case. Myers notes that he was honorably discharged from the military, but we also observe that there was testimony that Myers had been subject to disciplinary proceedings while enlisted. Moreover, when testifying at sentencing, Myers jumped at the opportunity to malign Kristen and cast himself as the victim. Myers claimed to be remorseful, but in the same breath made excuses and shifted blame to Kristen. For example, he said "I'm sorry for what I did. But you have to realize all the things that she has done to me, I haven't forgiven her for them." *Transcript Vol. VI* at 228. Myers stated further "I hate her guts sometimes when I think about all the things she's done to me." *Id.* at 229. Myers also said he felt he had "absolutely no control over" what he did to Kristen due to his alcoholism. *Id.* at 230. Myers noted, however, that he knew his drinking was "a big deal" after his felony conviction in 2014, and that he got treatment but "it was kind of a joke." *Id.* at 219. There is no indication that Myers sought any further treatment until he was incarcerated for the instant offenses. Myers's self-centeredness, refusal to take responsibility for his actions, and complete lack of insight into the causes of his own behavior are troubling, to say the least. Furthermore, although Myers claims to be a good father, we cannot help but note that he did everything in his power to leave his daughter motherless. There is nothing redeeming about Myers's character, and his sentence is entirely appropriate.

Judgment affirmed.

Bailey, J., concurs.

Baker, J., dissents with opinion.

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Casey Myers, | Court of Appeals Case No. |
| *Appellant-Defendant,* | 19A04-1704-CR-834 |
| v. | |
| State of Indiana, | |
| *Appellee-Plaintiff* | |

**Baker, Judge, dissenting.**

[33] I respectfully dissent. In my opinion, Myers did not knowingly and voluntarily waive his right to be present during the State's case-in-chief. As such, I would reverse and remand on that issue and would not address the latter two arguments raised by Myers.[4]

[34] Under certain circumstances, a defendant's express waiver of his right to be present at trial is unnecessary. *E.g.*, *Blatz v. State*, 486 N.E.2d 990, 991 (Ind.

---

[4] I do not disagree with the majority's conclusions on the latter two issues, I simply believe that they need not be addressed at all.

1985) (defendant out on bond pending trial and fails to appear at trial); *Wilson v. State*, 30 N.E.3d 1264, 1269-71 (Ind. Ct. App. 2015) (defendant engaged in disruptive behavior that repeatedly interrupted the trial), *trans. denied*. I find these types of cases readily distinguishable from the case at hand. Implying waiver where a defendant voluntarily fails to appear for trial while on bail can be justified based on (1) the fact that a defendant whose movements are not restricted can be presumed to act voluntarily; and (2) the necessity of preventing a defendant from interfering with the orderly conduct of a trial[5] by fleeing. As Myers points out, "[t]o require a hearing to determine whether a defendant has waived his right to be present under these circumstances would be pointless because the defendant's whereabouts are unlikely to be known." Appellant's Br. p. 22.

[35] In this case, however, Myers was in custody in Dubois County and, when the trial court summoned him after the State rested, he was present in the courtroom within fifteen minutes of the trial court's request. Tr. Vol. V p. 138. And contrary to the State's argument, there is zero evidence in the record that he had to be "forcibly dragged" into the courtroom or that transporting him to the courtroom would have presented any safety risks to third parties.[6]

---

[5] This second justification (absent the portion regarding flight) likewise applies to cases in which a defendant repeatedly disrupts a trial with inappropriate conduct and ignores the trial court's warnings to stop or risk exclusion from the proceedings.

[6] Had the State argued below that transporting Myers to the courtroom would have created a safety risk, the trial court should have conducted an on-the-record hearing creating an evidentiary basis from which to reach such a conclusion. But the State did not make that argument and the trial court did not hold a hearing.

Appellee's Br. p. 15. Instead, the record reveals that he was articulate and respectful, albeit mistaken in his rationale for declining to attend the trial.

[36] Indeed, Myers's mistaken rationale shows that even if I assume for argument's sake that his absence was voluntary, I cannot conclude that it was knowing or intelligent. Myers explained to the trial court that he did not attend the first few days of trial because he thought that the judge would be "mad" at him if he did not accept a plea agreement, that he would receive a maximum sentence regardless of what happened at trial, and that he would not be able to testify regarding the reasons why the incident between himself and the victim occurred. Tr. Vol. V p. 143. These statements do not indicate that he made a decision to waive his right to be present at trial with his eyes open; they do not show that he understood the possible benefit of conferring with counsel regarding trial tactics and strategic decisions that had to be made during the trial; and they do not show that he understood the benefit he could provide to his defense by providing real-time input as to possible cross-examination questions or the danger that, absent his input, his attorneys could have failed to ask certain questions that would have elicited information helpful to his defense. Instead, Myers's statements demonstrate a fundamental misunderstanding of the way in which a trial is conducted, giving me no confidence that his decision to waive his right to be absent at his trial was knowing or intelligent.

[37] It is true that there have been cases in which a defendant who was in custody has been tried in absentia without an express waiver in court. In each of these

cases, however, the trial court conducted some sort of on-the-record process or hearing that established an evidentiary basis for a finding that the defendant was expressly (and knowingly and intelligently) waiving his right to be present or that the defendant's conduct formed a sufficient basis to imply waiver.[7]

- In *Harrison v. State*, 707 N.E.2d 767, 785-86 (Ind. 1999), the custodial defendant refused to attend his sentencing hearing. The trial court then telephoned him in the presence of counsel, advised him of his rights, questioned him about his reasons for not attending court, and gave his attorney the opportunity to question and advise him as well.

- In *Adams v. State*, 509 N.E.2d 812, 813-14 (Ind. 1987), the custodial defendant refused to leave his jail cell. Before proceeding with the trial, the trial court held a hearing in the jail cell to ensure that the defendant's waiver was voluntary, knowing, and intelligent.

- In *Broecker v. State*, 168 Ind. App. 231, 233-37, 342 N.E.2d 886, 887-90 (Ind. Ct. App. 1976), the custodial defendant refused to attend his trial. The trial court held a hearing on the record at which an officer testified that the defendant wanted the trial to proceed without him. The trial court took "great pains" to make the defendant aware of his rights by having the court reporter accompany the defense attorney to the jail where a record was made of his refusal to attend the trial. *Id.* at 233, 342 N.E.2d at 887.

---

[7] Likewise, in each of the out-of-state cases cited by the State for the proposition that a custodial defendant may impliedly waive the right to be present at trial, the trial court held a hearing or provided some sort of process to form a basis for its finding that the defendant had voluntarily, knowingly, and intelligently waived the right to be present. Appellee's Br. p. 20.

By contrast, in this case, there is no evidence[8] in the record regarding Myers's waiver other than his after-the-fact statements to the trial court that, if anything, demonstrated fundamental misunderstandings about the legal process.

Here, the trial court knew where Myers was and was able to have him in the courtroom within fifteen minutes of making a request. But no direct inquiry was made of Myers, no advisement was made to him regarding the perils he faced if he declined to come to court for his trial, and no record was made establishing that forcing him to come to court would have caused a safety risk to himself or others. Under these circumstances, I can only conclude that the trial court erred by finding that Myers voluntarily, knowingly, and intelligently waived his right to be present at his trial. Therefore, I respectfully dissent.

---

[8] The trial court's comment that jail staff had stated, off the record, that Myers had "chosen not to appear for court today" does not constitute evidence. Tr. Vol. III p. 25.