

FILED

Apr 30 2015, 10:51 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

P. Jeffrey Schlesinger
Mark A. Bates
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Donnell D. Wilson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff,*

April 30, 2015

Court of Appeals Case No.
45A03-1409-CR-317

Appeal from the Lake Superior Court
The Honorable Salvador Vasquez, Judge
Cause No. 45G01-1303-MR-4

**Bradford, Judge.**

# Case Summary

[1]     On March of 2013, Jonte Crawford and Appellant-Defendant Donnell Wilson shot and killed two rival gang members. During Wilson's trial, the trial court allowed Appellee-Plaintiff the State of Indiana to enter into evidence several Twitter posts allegedly authored by Wilson which indicated that he was

involved in gang activity and was in possession of handguns similar to those used in the murders. A jury convicted Wilson of two counts of murder, Class B felony armed robbery, and Class D felony conspiracy to commit criminal gang activity. Following the convictions, the court proceeded to the second phase of the trial to determine whether Wilson's sentence would be enhanced for criminal gang activity. Immediately after closing arguments were heard, Wilson erupted into an argument with individuals in the gallery, struggled with the bailiffs, and was removed from the court and excluded from trial until the sentencing hearing. The jury found that Wilson's murder and robbery convictions should be enhanced for criminal gang activity.

[2] Wilson raises three issues on appeal: (1) whether the trial court properly admitted the Twitter messages into evidence; (2) whether Wilson's conviction for conspiracy to commit criminal gang activity should be vacated as being in conflict with his criminal gang activity enhancements; and (3) whether the trial court properly excluded Wilson from a portion of trial. We affirm in part, reverse in part, and remand to the trial court with instructions.

# Facts and Procedural History

[3] In March 17, 2013, fifteen-year-old Pecolla Crawford was walking home with her brother Jonte Crawford, their cousin Jordan Hendrix, and Wilson, who was dating Pecolla at the time. (Tr. 62-3) Hendrix was in town visiting and staying with Pecolla and Jonte. (Tr. 144) While the group was walking, they encountered fifteen-year-old Derrick Thompson, at which point Jonte and

Wilson began harassing and intimidating Thompson, flashing the guns they were carrying, and asking Thompson what part of town he was from. (Tr. 37, 148) Wilson was carrying a silver .357 revolver and Jonte had a black handgun. (Tr. 37, 149) Jonte then told Thompson to give him his phone and Wilson made a reference to Tre 7, a local gang, and grabbed Thompson's Dre Beats headphones off of his head. (Tr. 37-40, 69) The two then left Thompson and continued walking with Pecolla and Jordan.

[4] The group then encountered brothers Shaqwone Ham and Charles Wood. (Tr. 72) Jordan, who was friends with the brothers, exchanged greetings and continued walking with Pecolla. (Tr. 73) Pecolla then heard Jonte and Wilson begin to argue with the brothers. (Tr. 73) Wilson said, "Y'all looking for me? I'm in your hood." Tr. p. 153. A couple seconds later, Wilson shot Wood in the head. (Tr. 74, 153) As Ham attempted to run, Jonte shot him several times. (Tr. 153) Both Ham and Wood died as a result of their injuries. Shortly after the incident, police received calls from Thompson and a nearby resident who witnessed the shooting. (Tr. 57, 206-7) Jonte and Wilson were subsequently arrested and Thompson's phone and headphones were recovered from Jonte at the police station. (Tr. 471-72)

[5] Ham and Wood were members of the Dolla Boys gang, which was a subset of the larger Bottom Side gang. (Tr. 80, 161, 191-2) Wilson was part of several interrelated gangs including the Get Fresh Boys, Tre 7, and Glen Park Affiliated, all of which were at odds with the Bottom Side gangs. (Tr. 82, 151, 516) Wilson had posted several gang related comments on his Twitter account

including, "up for da bottom," referring to people from Bottom Side, "Tre 7 got da mac[1]," "Yea ima freshboy but im riding thru da bottom," and "Claim da bottom u get whacked." State's Exs. 13, 30, 31, 48. On March 12, 2013, Wilson tweeted "[If I] see a dolla he betta duck," state's ex. 25., and on the day of the murders, he tweeted, "GlenPark or get shot!!!" State's Ex. 20.

[6] On March 20, 2013, the State charged Wilson with two counts of murder, Class B felony armed robbery, and later amended the charging information to include Class D felony conspiracy to commit criminal gang activity. (App. 14, 20) Additionally, the State sought criminal gang sentencing enhancements for the murder and robbery charges. (App. 22)

[7] After Wilson's arrest and prior to trial, Wilson shared a cell with Israel Wiggins at the Lake County Jail. (Tr. 401) Wilson told Wiggins that he shot Ham and Wood because they were from Bottom Side. (Tr. 405) Wilson also told Wiggins that he belonged to the Get Fresh Boys gang and that he had had disputes on Twitter with people from the Bottom Side area of Gary. (Tr. 406-07) Wilson also told Wiggins that he had used a ".38 Special" in the shooting. Tr. p. 408. Wilson and some fellow inmates later jumped Wiggins because he was from the opposite side of Gary. (Tr. 409-10) After this, Wiggins was moved to the fourth floor of the jail where he met Jonte. (Tr. 404, 411) Jonte

---

[1] Pecolla testified that "mac" meant a gun.

showed Wiggins a picture of Wood lying on the ground and said, "We got good aim. You don't want to end up like him." (Tr. 412)

[8] Wilson's jury trial began on June 30, 2014. (App. 7) During Pecolla's testimony, the State sought to introduce Wilson's Twitter posts and Wilson objected, arguing that the State had not laid the proper foundation to identify the Twitter account as belonging to Wilson. (Tr. 85) The State argued that Pecolla's testimony that the Twitter account belonged to Wilson provided sufficient foundation. (Tr. 85) The trial court overruled Wilson's objection and permitted the Twitter messages to be introduced. (Tr. 88)

[9] After a four-day trial, the jury found Wilson guilty of the four charged offenses. (App. 7-8) Upon announcing the jury's verdict, the court immediately began the criminal gang activity enhancement phase of the trial. (Tr. 680) As the trial court was giving final instructions to the jury, there was an outburst from an individual in the gallery, Wilson began yelling profanities at the individual, struggled with the bailiffs, and was ultimately removed from the courtroom. (App. 707-08) The trial court found that Wilson's outburst constituted a waiver of his right to be present for the second phase of the trial. (Tr. 708) The jury found Wilson guilty on the criminal gang activity enhancements with regards to his convictions for murder and armed robbery. (App. 7) The trial court sentenced Wilson to consecutive terms of sixty years for the first murder conviction, fifty-five years for the second murder conviction, six years for armed robbery, and two years for criminal gang activity, with an additional

sixty years pursuant to the criminal gang activity enhancement for an aggregate sentence of 183 years. (App. 7)

# Discussion and Decision

Wilson raises three issues on appeal: (1) whether the State provided sufficient foundation to authenticate the Twitter messages; (2) whether Wilson's conviction for conspiracy to commit criminal gang activity should be vacated as being in conflict with his criminal gang activity enhancements; and (3) whether the trial court properly excluded Wilson from a portion of trial.

# I. Authentication of Twitter Account

Admission or exclusion of evidence is within the sound discretion of the trial court and we will reverse such a decision only if the trial court abused that discretion. *Kindred v. State*, 973 N.E.2d 1245, 1252 (Ind. Ct. App. 2012). An abuse of discretion occurs when the trial court's decision is clearly against the logic, facts, and circumstances presented. *Id*. We do not reweigh evidence or judge the credibility of witnesses, and we consider conflicting evidence most favorable to the trial court's ruling. *Id*.

Wilson contends that the Twitter messages were not properly authenticated as having been authored by him. Indiana Rules of Evidence Rule 901(a) provides that "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "Once this reasonable

probability is shown, any inconclusiveness regarding the exhibit's connection with the events at issue goes to the exhibit's weight, not its admissibility. Additionally, authentication of an exhibit can be established by either direct or circumstantial evidence." *Pavlovich v. State*, 6 N.E.3d 969 (Ind. Ct. App. 2014) *trans. denied*, (citing *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*)). Letters and words set down by electronic recording and other forms of data compilation are included within Rule 901(a). *Hape v. State*, 903 N.E.2d 977, 989 (Ind. Ct. App. 2009). "Absolute proof of authenticity is not required." *Fry*, 885 N.E.2d at 748.

[13] Rule 901(b) provides examples of evidence that satisfies the authentication requirement, including "(1) *Testimony of a Witness with Knowledge*. Testimony that an item is what it is claimed to be, by a witness with knowledge," and "(4) *Distinctive Characteristics and the Like*. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." We have previously acknowledged that federal courts have recognized Federal Rule of Evidence 901(b)(4) as one of the most frequently used means to authenticate electronic data, including text messages and emails. *Hape*, 903 N.E.2d at 990 (citing *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 546 (D. Md. 2007)).[2]

---

[2] The language of Federal Rule 901(b)(4) is identical to the language of Indiana's Rule 901(b)(4).

[14] We are unaware of any cases in which an Indiana court has addressed the issue of authentication of social media posts. However, we addressed a similar fact pattern in *Pavlovich* which concerned the authentication of text and email messages where there was no direct evidence connecting the defendant to the phone number or email address that sent the messages at issue. 6 N.E.3d at 976. Pavlovich had been using a "2662" phone number and an email address to attempt to solicit sex from a minor. *Id*. Neither the email address nor the 2662 number were associated with Pavlovich's name or address. *Id*. However, a witness testified that she was familiar with Pavlovich and had previously communicated with him at the 2662 number and email address, and the content of the communication between her and Pavlovich corroborated her identification of Pavlovich as the sender of the messages. *Id*. at 979. Additionally, the user of the email address stated that he was staying at a Marriott on the north side of Indianapolis and a detective confirmed that Pavlovich was registered at a Marriott on the north side of Indianapolis where he was subsequently apprehended. *Id*. at 978. The texts also indicated that the user of the number did not live in central Indiana but traveled there frequently. *Id*. at 979. We concluded that the circumstantial evidence was sufficient to authenticate the text and email messages as being authored by Pavlovich. *Id*. at 978.

[15] In the instant case, Pecolla testified that she often communicated with Wilson on Twitter and that he had posted pictures of the two online. (Tr. 83) She then identified the Twitter account at issue as belonging to Wilson based on her

general knowledge of the account by its name "@Nell_FearNoMan" and the header of the account. Additionally, there were pictures posted from the account which depict Wilson holding guns that match the description of those used in the crimes. (State's Ex. 15, 16) Pecolla testified that Wilson lived in Glen Park and was a member of the Glen Park gang, that Wilson was affiliated with the Get Fresh Boys and Tre 7 gangs, and that he would often use the terms "GFB," "Get Fresh Boys," and "Tre 7" on the internet. Tr. p. 82. The @Nell_FearNoMan Twitter account frequently used those same terms and revealed a clear affiliation with those groups.

[16] Consequently, we think that taken together, the witness testimony identifying the Twitter account as belonging to Wilson and the content posted on the account, including pictures and gang references, are more than sufficient to authenticate the Twitter posts as being authored by Wilson.

## II. Criminal Gang Activity Enhancement

[17] Article I, Section 14 of the Indiana Constitution provides in part: "no person shall be put in jeopardy twice for the same offense." Wilson was convicted of Class D felony conspiracy to commit criminal gang activity under Indiana Code section 35-45-9-3 and received criminal gang enhancements under Indiana Code section 35-50-2-15. However, Section 35-50-2-15(a) states that "This section does not apply to an individual who is convicted of a felony offense under IC 35-45-9-3." Therefore, it was impermissible for Wilson to be

convicted under Section 35-45-9-3 and simultaneously receive an enhanced sentence under Section 35-50-2-15. The State concedes this point.

[18] The Indiana Supreme Court has held that when two convictions are found to violate double jeopardy principles, it is appropriate for the reviewing court to "vacate the conviction with the less severe penal consequences and leave standing the [remaining] conviction." *Richardson v. State*, 717 N.E.2d 32, 55 (Ind. 1999). Accordingly, we remand with instructions that the trial court vacate Wilson's conviction for Class D felony conspiracy to commit criminal gang activity and leave standing the remaining enhanced sentences.

# III. Wilson's Exclusion from Trial

[19] The Sixth Amendment to the United States Constitution and Article I, Section 13 of the Indiana Constitution grant a defendant in a criminal proceeding the right to be present at his or her own trial. *See Campbell v. State*, 732 N.E.2d 197, 204 (Ind. Ct. App. 2000). However, this right, under either the United States or Indiana Constitutions, may be waived if such waiver is made knowingly and voluntarily. *Id*. Both this court and the United States Supreme Court have held that significantly contemptuous conduct by a defendant can function as a knowing and voluntary waiver of their right to be present. *Id.*; *Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970).

[20] It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. *We believe trial judges confronted with disruptive, contumacious, stubbornly*

*defiant defendants must be given sufficient discretion to meet the circumstances of each case.*

\* \* \*

The trial court in this case decided under the circumstances to remove the defendant from the courtroom and to continue his trial in his absence until and unless he promised to conduct himself in a manner befitting an American courtroom. As we said earlier, we find nothing unconstitutional about this procedure.

*Allen*, 397 U.S. at 343, 345-46 (emphasis added). We review the decision to exclude Wilson for an abuse of discretion. *Id*.; *see also Campbell v. State*, 732 N.E.2d at 206. An abuse of discretion occurs when the trial court's decision is clearly against the logic, facts, and circumstances presented. *Kindred*, 973 N.E.2d at 1252. We do not reweigh evidence. *Id*.

[21] Following closing arguments during the enhancement phase of the trial, an outburst occurred between Wilson and members of the gallery.

> Court: For the record, we – during that small outburst starting with those in the audience, Mr. Wilson also had an outburst, he struggled with my bailiffs, he yelled out a few words of profanity, directed those to members of the audience. He's been escorted out. He is – I think he at this point, he has waived his right, his opportunity to be here during this phase of the trial. We will proceed without him given his conduct at this point.

Tr. p. 708. After the outburst, the trial court held a hearing on whether Wilson should be held contempt. Wilson then engaged in the following exchange with the court:

> Court: Mr. Wilson, you had quite an incredible outburst just now….I'll give you one opportunity to try to explain yourself before I decide whether I should hold you in contempt of court.

\* \* \*

Wilson: Well, seeing they (inaudible.) Y'all don't see that, though, do y'all? Y'all don't see that, though, right? I got nothing to say. Charge me with what you want.

Court: All right. I hold you in contempt.

Wilson: That's cool. Shake your hand for it?

Court: Pardon me?

Wilson: F*** a appeal.

Court: Oh, no, no, no. I hold you in contempt….I think you forfeited your right to be a part of this case, for this last phase of the trial.

Wilson: That's cool, too. Send me back. I'm tired. I need to sleep.

Tr. p. 711-12. The trial court allowed Wilson to return for the sentencing hearing after he agreed to and did write a letter of apology.

[22] Wilson argues that the trial court's decision to exclude him from trial was erroneous because the trial court did not first warn Wilson that he could be removed for being disruptive and instead removed him immediately following his first and only outburst. Wilson cites to *Perry* and *Allen* where the defendants were disruptive several times throughout trial and were first warned before they were ultimately removed from the courtroom. *Perry v. State*, 471 N.E.2d 270, 275 (Ind. 1984); *Allen*, 397 U.S. at 340.

[23] We find that the trial court was within its discretion to remove Wilson from the courtroom. Unlike the cases cited above, Wilson not only used profanity and generally disrupted the proceedings, but also became physical with the bailiffs. Furthermore, he continued to exhibit contumacious behavior in the contempt hearing, used profanity directed at the court, and agreed with the trial court's decision to exclude him from the trial. These actions amount to a waiver of

Wilson's sixth amendment and Article I, Section 13 rights. Accordingly, the trial court did not abuse its discretion by excluding Wilson from a portion of the trial.

[24] The judgment of the trial court is affirmed in part, reversed in part, and remanded to the trial court with instructions that Wilson's conviction for Class D felony conspiracy to commit criminal gang activity be vacated and the remaining aggregate 181-year sentence be imposed as is.

Vaidik, C.J., and Kirsch, J., concur.