# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 28 2019, 11:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David M. Payne
Ryan & Payne
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Nicholas D. Thrash, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | June 28, 2019 <br><br> Court of Appeals Case No. 18A-CR-2434 <br><br> Appeal from the Grant Superior Court <br><br> The Honorable Jeffrey D. Todd, Judge <br><br> Trial Court Cause No. 27D01-1705-F1-2 |

**Robb, Judge.**

# Case Summary and Issues

[1] Thirty-four-year-old Nicholas Thrash was charged with ten counts of Level 1 felony child molesting. An investigation revealed (among other things) to a 99.999% certainty that he was the father of the baby that his girlfriend's then eleven-year-old daughter birthed. During voir dire, and again at trial, and in violation of an order in limine, Thrash attempted to communicate to the jury inadmissible allegations regarding the victim's sexual history. He was repeatedly admonished and eventually removed from the courtroom for the remainder of his trial. During trial, but prior to Thrash's removal, certain pictorial exhibits were introduced by the State and admitted into evidence over his objection. A jury convicted Thrash as charged, and the trial court sentenced him to an aggregate term of 160 years executed in the Indiana Department of Correction ("DOC"). Thrash appeals his convictions and sentence, raising three issues for our review, which we re-state as: (1) whether the trial court abused its discretion by removing him from the courtroom for the remainder of his trial; (2) whether the trial court abused its discretion in admitting certain photographs into evidence; and (3) whether his sentence is inappropriate in light of the nature of the offenses and his character. Concluding that the trial court did not abuse its discretion, and that the sentence is not inappropriate, we affirm.

# Facts and Procedural History

[2] In the summer of 2016, ten-year-old S.D. and her mother, Jennifer Hand, lived in Georgia. At the time, Hand had been dating Thrash for a few years, and the two enjoyed an intimate relationship. In July 2016, Hand called her father, who lived in Indiana, and asked if she, S.D., Thrash, and S.D.'s brother could come for a visit. She had not spoken to her father in two or three years. Hand's father readily agreed, and the family came to Indiana, with Hand telling S.D. that they would visit for two weeks. After approximately a week, Thrash and Hand left Indiana and returned to Georgia, while S.D. and her brother remained in Indiana. Approximately two to three weeks later, Hand called S.D. and told her that the family would be permanently moving to Indiana.

[3] After living with Hand's father for a period of time, the family moved into a home on Race Street, in Marion, in August 2016. In the Race Street house, Thrash molested S.D. by subjecting her to sexual intercourse in her bedroom and in her mother's bedroom. The molestations took place when Hand was either at work or at the home asleep. Thrash would have sex with S.D. until he ejaculated either onto whatever surface upon which he was molesting her or inside of her. On those occasions when he would ejaculate inside of her, he would use a rag and attempt to wipe his semen out of her. Thrash never wore a condom.

[4] In February 2017, the family moved to a house on Spencer Avenue, in Marion, where Thrash continued to molest S.D. The molestations occurred on couches

located in the family's living room and dining room and also occurred in the bedrooms. Thrash told S.D. "not to tell or we both are gonna get in trouble." Transcript, Volume 2 at 183. Between the two Marion residences, Thrash molested S.D. at least fifteen times. S.D. testified that she was afraid of Thrash.

[5] On May 4, 2017, S.D. was with her mother trying on dresses for a school dance to be held the next day. While S.D. was dressing, Hand noticed that S.D. appeared to have a "baby bump." *Id.* at 165. S.D. denied that "anybody [had] been messin' with [her]." *Id.* at 166. Hand and S.D. then traveled to Walmart, and Hand purchased a home pregnancy test. When they returned home, S.D. took the test. It indicated that S.D. was pregnant. Hand began to cry, and S.D. then told Hand that Thrash had been molesting her. Hand confronted Thrash, but Thrash remained in the family's home. Hand told S.D. to respond to inquiries about her pregnancy by saying that "it was the boy from school." *Id.* at 197.

[6] On May 9, 2017, Hand took S.D. to an abortion clinic in Indianapolis. However, because Hand did not have proper documentation for S.D., staff at the clinic would not proceed with the intake process. Upon leaving the clinic, the two noticed an RV in a nearby parking lot that was operated by the Gabriel Project—"a ministry for pregnant women who find themselves in crisis." *Id.* at 114. Hand and S.D. entered the RV, inside of which was an ultrasound machine. An ultrasound was performed, and it was determined that S.D. was approximately nineteen weeks (five months) pregnant. After Hand and S.D. left the RV, the ultrasound operator, feeling uneasy about S.D.'s pregnancy at

such a young age, contacted the Indiana Department of Child Services ("DCS").

[7] DCS began an investigation and conducted two forensic interviews with S.D., during which S.D. disclosed that Thrash had been molesting her. After the first interview, S.D. was taken immediately to a hospital to confirm the pregnancy. Hospital staff confirmed that S.D. was almost five months pregnant. S.D. would have been ten years old when the child was conceived. On May 16, 2017, Thrash was arrested and charged with ten counts of Level 1 felony child molesting.[1] S.D. was removed from her home and placed in foster care.

[8] S.D. gave birth to her child on September 16, 2017. DNA testing determined to a 99.999% certainty that Thrash was the child's father.

[9] A three-day trial commenced on August 27, 2018. At the conclusion of the trial, a jury found Thrash guilty as charged. A sentencing hearing was conducted on September 21, 2018. The trial court imposed forty-year sentences on each of the ten counts, ordering four of the sentences to be served consecutively and the remainder to be served concurrently for an aggregate sentence of 160 years executed in the DOC. Thrash now appeals his convictions and sentence. Additional facts will be supplied as necessary.

---

[1] Hand, who is not a party to this appeal, was also arrested and criminally charged. Outside of the presence of the jury, she was called by the defense to testify at Thrash's trial, however, she exercised her Fifth Amendment right not to incriminate herself.

# Discussion and Decision

## I. Abuse of Discretion

[10] Thrash contends that the trial court abused its discretion in two ways: (1) when it removed him from the courtroom and continued the trial in his absence; and (2) when it admitted certain photographs into evidence over Thrash's objection. We address each argument in turn.

## A. Exclusion From Trial

### *1. Underlying Facts*

[11] Prior to the start of the trial, the State filed a motion in limine to prevent Thrash from introducing evidence that (1) S.D. had allegedly been inappropriately touched in the past by a cousin, and (2) that S.D.'s foster father "was being investigated for inappropriate communications with [S.D.] and/or inappropriate contact with [S.D.]." Appellant's Appendix, Volume 2 at 112. The trial court heard arguments on the motion and, ultimately, granted it.

[12] Later, during voir dire, Thrash composed and exhibited a sign to potential jurors that read as follows: "[S.D.] Have had Sex With 3 Different Grow Men She's not as Innocent as They Make Her Out to Be. She have 4 Open Sex Cases[.]" Exhibits, Confidential Volume 4 at 103 (formatting and grammar preserved). When the State approached the bench to bring the sign to the trial court's attention, the following colloquy ensued:

> [Prosecutor:] . . . the Defendant held up a piece of paper for the jury. [Court staff] just told him to stop.

THE COURT:  Mr. Thrash.

[Thrash:]  She had sex . . .

THE COURT:  . . . you're not, you're not allowed to speak to any of the jurors . . .

[Thrash:]  . . . four different grown men, four different cases open …

THE COURT:  . . . alright . . .

[Thrash:]  . . . she ain't innocent as she look . . .

THE COURT:  . . . Okay, Deputy, remove him from the courtroom at this time, please . . .

[Thrash:]  . . . married men.  I'm not the only one.

COURT REPORTER'S NOTE: DEFENDANT ESCORTED OUT OF THE COURTROOM

THE COURT:  We're going to take a recess and convene in Circuit Court . . .

[Thrash:]  . . . child molest, four different grown men . . .

THE COURT:  . . . we'll take a short recess . . .

[Thrash:]  . . . four different cases.  They locked up.  She admitted to it . . .

Tr., Vol. 2 at 96-97 (multiple individuals speaking at once).

[13]   The parties then convened in a different courtroom outside of the presence of potential jurors, and the trial court admonished Thrash as follows:

> The Defendant just engaged in behavior that can only be described as disorderly and disruptive. Mr. Thrash, you do have the right to be present at your trial. However, you can lose the right to be present at your trial if you continue your disruptive behavior which includes speaking to the jury if you're not testify[ing], speaking while you're at counsel table or displaying any message to the jury.

*Id.* at 97. Thrash stated that he understood the warning. The trial court reiterated that if Thrash engaged in further disruptive behavior, he would be removed from the courtroom. Thrash again indicated his understanding, but then complained to the trial court about the order in limine, stating:

> So[,] they filed that motion [to] strike to what we can't say. We have no point to argue. They filed a motion and striked [sic] what we was gonna use, and you allowed it. . . . So I, I figured the jury needed to be heard whether, I mean, I'll take the contempt of court or the charge.

*Id.* at 98. The trial court concluded the matter by asking Thrash if he understood that "there will be no further warnings? You'll simply be removed from the trial?" *Id.* at 99. Thrash answered in the affirmative. When the parties returned to the courtroom, the trial court admonished the potential jurors that "[a]ny comments made by the Defendant or anything he showed the

jury in writing is to be disregarded by you. You're not to consider it [in] any way." *Id.* at 101. A jury was selected, and the trial began.

[14] After evidence was presented, the State rested. Defense counsel then informed the trial court that Thrash would testify in his own defense. Before he testified, however, and outside of the jury's presence, Thrash was questioned by his counsel regarding the order in limine, and Thrash indicated that he understood "what content [he was] not allowed to discuss[.]" Tr., Vol. 3 at 72.

[15] Thrash then took the stand. During direct examination, he repeatedly denied having sexual intercourse with S.D. He claimed that S.D. became pregnant by "her mother[,]" explaining that "[Hand] would, we would have sex, seaman [sic] would be in condoms, and [Hand] would put it in [S.D.]." *Id.* at 78. According to Thrash, Hand "was obsessed with having [his] child." *Id.* When asked if he ever did anything to discourage this alleged practice, Thrash responded: "Several times. I thought [it] was crazy. But she, we tried five times to have a child, and she succeeded not once, and she knew that her daughter was sexually active. So, she used that . . . ." *Id.* at 80. The State objected, and the trial court sustained the objection, struck the comment from the record, and admonished the jury not to consider the comment "in any way." *Id.*

[16] During cross examination, the State asked Thrash about a 2012 theft conviction in Meriwether County, Georgia. Thrash denied having such a conviction even

when confronted with a signed pleading. Thereafter, the following colloquy took place:

> [Prosecutor:] . . . would you answer my question[?] Have you ever been to Meriwether County?
>
> [Thrash:] Yeah. With [S.D.] when she had sex with other grown men . . .
>
> THE COURT: . . . alright, Ms. Martin, will you take the jury out of the courtroom at this time . . .
>
> [Thrash:] . . . she got other sex cases, twenty-six[-]year[-]old married men . . .
>
> THE COURT: . . . Any comments made by the Defendant at this time are not to be considered by the jury . . .
>
> [Thrash:] . . . Momma put sperm inside her to have a baby. Ain't no way she can prove ten counts. She didn't say ten times. She lied. They got CDs recorded. They don't want to show you the CDs . . .

*Id.* at 84. Following the unsolicited comments, the jury was removed from the courtroom. Thereafter, the following colloquy ensued:

> THE COURT: Alright. Mr. Thrash, you were warned on Monday about your conduct and your disregard of the Court's orders . . .
>
> [Thrash]: . . . yes, sir.

THE COURT: Your outburst today is so disruptive to the trial process that it cannot be carried out with you in the courtroom. I'm instructing the deputies to remove you from the courtroom at this time.

[Thrash]: Thank you.

*Id.* at 84-85.

[17]     Outside of the jury's and Thrash's presence, the trial court established the following for the record:

> Just to make the record clear, I think it is already clear. On Monday, the Defendant was warned that if he continued his disruptive behavior, the Court would find that he waived his right to be present during the course of the trial. Clearly before he even testified he was warned again about the Order in Limine, and that he was not [to] violate that Order in Limine. He did so, and in fact while on the witness stand would to [sic] respond to any of the Court's commands. He would not answer questions asked of him. He was simply telling the jury what he wanted them to hear in violation of the Court's prior orders. Under those circumstances, the Court finds the Defendant has in fact waived his right to be present during the trial. After having been warned, his conduct would result in him being removed from the trial. His behavior was so disruptive, disorderly and disrespectful the trial could not and cannot be carried on with him in the courtroom. So[,] he will not be present during the rest of the trial. I want to make clear though, the Defendant was being cross-examined. In essence, the State has lost the ability to fully question the Defendant on cross-examination. While I've ruled the Defendant has waived his right to be present, if the State asks for him to be back on the witness stand, I will bring him back over from the jail. Does the State wish to do so?

*Id.* at 86.  The State answered the trial court's question in the negative.

[18] Defense counsel informed the court that he had instructed Thrash "numerous times that there was a Motion in Limine, and [Thrash] indicated that he was aware of it."  *Id.*  When asked by the trial court, Thrash's counsel indicated that he had no objection to the removal.  The defense rested, and the trial court then reconvened the jury and told the jurors why Thrash was removed from the courtroom and why he would not be present for the remainder of the trial.

## *2. Standard of Review*

[19] We review a trial court's decision to remove a defendant from the courtroom and continue his trial in his absence for an abuse of discretion.  *Wilson v. State*, 30 N.E.3d 1264, 1270 (Ind. Ct. App. 2015), *trans. denied*.  "An abuse of discretion occurs when the trial court's decision is clearly against the logic, facts, and circumstances presented.  We do not reweigh evidence."  *Id.* (citations omitted).

[20] The record before us clearly indicates that Thrash did not preserve his claim of error by raising proper objections at trial.  Thrash seeks to avoid this procedural default by establishing that fundamental error occurred.  "Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible."  *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014) (quotation and citations omitted).  "This exception is

available only in egregious circumstances." *Halliburton v. State*, 1 N.E.3d 670, 678 (Ind. 2013) (internal quotation marks omitted).

### 3. Thrash's Removal from the Courtroom

[21] Thrash maintains that his behavior should not have resulted in his removal from the courtroom because he was simply "attempting to communicate to the jury information he thought would be helpful to his defense. He was not cussing, shouting or screaming or otherwise being disrespectful to the court." Appellant's Brief at 22. He notes that his "comments mostly were focused at the beginning of trial and near the end of trial[;]" "[h]is latter comments, which got him ejected, occurred not while other witnesses were testifying, but [while] he was on the witness stand[;]" and that the "trial court's position, that you've been warned and now you're out, is a very hard rule." *Id.* at 25-26. According to Thrash, the trial court's admonishment of the jury "should have sufficed[,]" *id.* at 26, because his comments were potentially detrimental to his defense (that he did not have sexual intercourse with S.D.), and the State's case was not harmed by his behavior.

[22] The Sixth Amendment to the United States Constitution and Article 1, section 13 of the Indiana Constitution grant a defendant in a criminal proceeding the right to be present at all stages of his trial. *Wilson*, 30 N.E.3d at 1269. However, that right may be waived if it is done so knowingly and voluntarily. *Id.* "[S]ignificantly contemptuous conduct by a defendant can function as a knowing and voluntary waiver of [his] right to be present" at any stage of his

trial. *Id.* As we stated in *Campbell v. State*, 732 N.E.2d 197, 205 (Ind. Ct. App. 2000) (quoting *Illinois v. Allen,* 397 U.S. 337, 343 (1970)):

> [A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.

Furthermore, "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Allen*, 397 U.S. at 343.[2]

[23] Here, the record reveals that Thrash knew that a motion in limine had been granted and that certain allegations of sexual misconduct perpetrated upon S.D. could not be introduced at trial. Thrash ignored the order and, during voir dire, displayed a written message to potential jurors in an effort to taint jurors' views of the victim, and then attempted to verbally convey to the jurors the message he had written. After the parties reconvened in a different courtroom, the trial court informed Trash that his behavior was considered disorderly and disruptive. He was then told three times that continued engagement in such behavior would result in his removal from the courtroom, and he was told that

---

[2] In *Campbell*, we noted that, although the United States Supreme Court in *Allen* was only addressing the Sixth Amendment right to be present at trial, "we can perceive of no reason why an identical waiver rule should not also be applicable to Article I, section 13 of the Indiana Constitution." *Campbell*, 732 N.E.2d at 205.

removal would come without any additional warnings. Though Thrash indicated that he understood the trial court's warnings, he again violated the order in limine and attempted to convey to the jurors his views of the victim's sexual behavior when he testified in his own defense.

[24] We find that no error, fundamental or otherwise, occurred here. Thrash was told numerous times that his inappropriate behavior would result in his removal from the courtroom. He chose to ignore the trial court's warnings and repeatedly attempted to place before the jury his personal views of the victim. Thrash's disruptive actions amounted to a waiver of his Sixth Amendment and Article 1, section 13 rights. *Campbell,* 732 N.E.2d at 205. Accordingly, the trial court did not abuse its discretion by removing Thrash from the courtroom for the remainder of his trial.

# B. Admission of Evidence

[25] Thrash next argues that the trial court erred in admitting into evidence State's Exhibits 22 through 27, which included photographs of S.D. and her newborn baby. Thrash's argument is twofold: first, he argues that the trial court should have afforded him additional time to investigate the photographs, due to the State's failure to include the photos during discovery; and second, he argues that the photographs' probative value was outweighed by their prejudicial impact.

## 1. *Underlying Facts*

During S.D.'s testimony at trial, the State sought to admit six photographs of S.D. and her baby, including photos taken of S.D. when she was at her forensic interview, at the hospital after the forensic interview, at her school, and at a restaurant with her brother, as well as a photograph of S.D.'s baby and one of S.D. holding her baby—both of which were taken at the hospital. Thrash objected on grounds that the State had not provided copies of the photos in discovery. The State responded that the photos were on a CD that was supplied to defense counsel, but defense counsel claimed that the CD did not contain the photos in question. The State then responded that any omission was inadvertent.

Thrash's counsel then asked for time to review the photos, and the trial court recessed the trial for a lunch break. When the parties returned, Thrash renewed his objection, and the following colloquy took place:

> [Defense:] . . . This case has been pending for quite some time. Today is the first opportunity we saw those photographs. The Motion for Discovery has been on file for over a year now. Same objection, they weren't, they weren't turned over in discovery, and I don't believe that it's proper for them to come in now.
>
> THE COURT: The exhibits themselves having examined them, do you believe that you are in need of additional investigation if those exhibits are introduced or prior to introduction?

[Defense:] When speaking to my client prior to the break, Judge, he asked that we would have the opportunity to be able to do that so we are requesting that at, at this time.

THE COURT: What type of investigation are you talking about?

[Defense Counsel:] Um, well we really have no context of the pictures or when they were taken, um, potentially somebody could look at those and verify the authenticity of those photographs. Just seeing them and looking at them briefly over the lunch break, Judge, um, that's all we've had at this time. I mean additional things could come up, um, it's just, within just now being, . . . seen by us, uh, that would be our request, and we believe, and I know my client would like to have somebody have the opportunity to look at that and investigate or perhaps possibly have our investigator look at those further.

\*\*\*\*\*

I mean at this point we don't know anything about 'em other than they are photographs some of the alleged victim, some of the, the baby in which the DNA tests were, were taken from. We also have no, no time frame on when those photographs were taken.

Tr., Vol. 2 at 189-90.

[28]  The State maintained that it had disclosed the photographs to Thrash's counsel before trial and that any omission was inadvertent. The State then offered the following in support of its argument that the photographs should be admitted into evidence:

[T]he jury has heard testimony all morning about [S.D.] being pregnant and the baby being born. [S.D.], these photographs, um, 22 through 25 are photographs of [S.D.]. She has identified those photographs and where they were, where each photograph was taken. So[,] she certainly provided the authenticity of them, and then 26 and 27 are the photographs of the baby. [S.D.]'s in 27. So again, she's identified, uh, there's been testimony she had the baby on September 16 of 2017, um, and she's, um, created the or testified to the authenticity of those. These are, these photographs are just simply illustrative of what the testimony's already been. I mean, there's been testimony that she's pregnant and had a baby. So[,] these are just simply illustrative of what the jury has already heard.

*Id.* at 190. The trial court, noting that it is "never pleased about late discovery," overruled Thrash's objection and allowed the photographs to be admitted, stating: "Having seen those exhibits briefly, it's the Court's belief that the lunch recess and overnight are sufficient time to investigate, so I'm not going to continue the case any further at this point."[3] *Id.*

## 2. Standard of Review

[29] We typically review rulings on the admission of evidence for an abuse of discretion. *Pavlovich v. State*, 6 N.E.3d 969, 975 (Ind. Ct. App. 2014), *trans. denied*. An abuse of discretion occurs if the trial court misinterpreted the law or

---

[3] Although the trial court stated that defense counsel had "overnight" to review the photographs in question, the record indicates that counsel had only the lunch-break recess to review the photos. *See* Tr., Vol. 2 at 188-90.

if its decision was clearly against the logic and effect of the facts and circumstances before it. *Id.*

### 3. Additional Time to Review Photographs

[30] Thrash essentially asserts that, because the State provided him with copies of the photographs in question during trial, and well after the discovery deadline, the trial court should have provided him with the additional time he requested to investigate the photos. Trial courts have broad latitude with respect to discovery matters, and their rulings receive great deference on appeal. *Cain v. State*, 955 N.E.2d 714, 718 (Ind. 2011). The primary factors that a trial court should consider when addressing a discovery violation are "whether the breach was intentional or in bad faith and whether substantial prejudice has resulted." *Id.* (quoting *Wiseheart v. State*, 491 N.E.2d 985, 988 (Ind. 1986)). We will affirm a trial court's ruling absent clear error and resulting prejudice. *Id.*

[31] Thrash has not shown that the State's omission regarding the photographs was intentional or in bad faith. To the contrary, the State maintained that the omission was inadvertent. The trial court then provided Thrash with time, during the lunch-break recess, to review the photographs. Thrash does not explain how he was prejudiced by the omission, and he does not explain what sort of investigation he would need to undertake regarding the photos. Because Thrash has not demonstrated either that the State's late disclosure was intentional or in bad faith or that he suffered substantial prejudice as a result of the omission, we find that the trial court did not abuse its discretion when it admitted the photographs into evidence.

### *4. The Photographs of S.D. and Her Baby*

[32]     Next, Thrash contends that the prejudicial impact of the photographs outweighed any probative value. He maintains that "State's Exhibit 22, a picture of S.D. [in a hospital waiting room] playing with toys is prejudicial in that it purports to show she is a small child[,]" and that "State's Exhibits 26 and 27 include pictures of the baby that was born, which would largely serve to arouse sympathy among the jury members."[4] Appellant's Br. at 30.

[33]     Because the admission and exclusion of evidence falls within the sound discretion of the trial court, this court reviews the admission of photographic evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). All relevant evidence is generally admissible. Ind. Evidence Rule 402. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evid. R. 401. Relevant evidence, including photographs, "'may [be excluded] . . . if [their] probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Evid. R. 403.

[34]     Error in the admission or exclusion of evidence is to be disregarded as harmless unless it affects the substantial rights of a party. *King v. State*, 985 N.E.2d 755,

---

[4] The State asserts that this argument is waived due to Thrash's failure to object at trial on this ground. *See White v. State*, 772 N.E.2d 408, 411 (Ind. 2002) ("A party may not object on one ground at trial and raise a different ground on appeal."). Waiver notwithstanding, we address Thrash's argument.

757 (Ind. Ct. App. 2013), *trans. denied.* The improper admission of evidence is harmless when the conviction is supported by substantial independent evidence of guilt that satisfies us that there is no substantial likelihood the questioned evidence contributed to the conviction. *Mathis v. State*, 859 N.E.2d 1275, 1280 (Ind. Ct. App. 2007).

[35] While we recognize that photographs of S.D. playing with toys, of her baby shortly after he was born, and of S.D. holding her newborn baby could have elicited an emotional response from the jury, we, nevertheless, find that any resulting prejudice from the admission of the photographs was harmless. When the photographs were introduced at trial, several witnesses had already presented testimony regarding S.D.'s young age, her pregnancy, and the birth of her baby. During trial, the State presented substantial independent evidence that Thrash molested S.D. on numerous occasions and was the biological father of her child. Because of the substantial independent evidence of Thrash's guilt, we see no substantial likelihood that photographs of S.D. and her baby contributed to Thrash's conviction.

## II. Inappropriate Sentence

[36] Thrash next argues his sentence is inappropriate in light of the nature of his offenses and his character. At sentencing, the trial court found four aggravating factors: Thrash's criminal history; the "harm, injury, and damage suffered by [S.D.] was significant and greater than the elements necessary to prove the commission of the offense[;]" Thrash was in a position of having care and

control of S.D.; and Thrash was on probation when he committed the instant offenses. Appellant's App., Vol. 2 at 19-20. The trial court imposed forty-year sentences for each of the ten child molesting convictions with "Counts 1 through 4 [ordered to] run consecutive to each other, but concurrent with Counts 5 through 10, which themselves will run concurrent to each other." Tr., Vol. 3 at 119. Hence, he received a 160-year aggregate sentence. The trial court also found that he was a credit-restricted felon, under Indiana Code section 35-31.5-2-72(1).[5] Thrash's specific argument is that the imposition of consecutive sentences was inappropriate. He asks this court to revise his sentence such that "all counts are served concurrently." Appellant's Br. at 20.

## A. Standard of Review

[37] We may review and revise criminal sentences pursuant to the authority derived from Article 7, Section 6 of the Indiana Constitution. Indiana Appellate Rule 7(B) empowers us to revise a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Because a trial court's judgment "should receive considerable deference[,]" our principal role is to "leaven the outliers." *Cardwell v. State*, 895 N.E.2d 1219, 1222-25 (Ind. 2008). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality)

---

[5] A credit restricted felon is initially assigned to credit time Class C, *see* Indiana Code section 35-50-6-4(c), earning one day of credit time for every six days the person is imprisoned for a crime or confined awaiting trial or sentencing. Ind. Code § 35-50-6-3.1(d).

and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). The defendant bears the burden to persuade this court that his or her sentence is inappropriate, *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006), and we may look to any factors appearing in the record for such a determination, *Stokes v. State*, 947 N.E.2d 1033, 1038 (Ind. Ct. App. 2011), *trans. denied*.

*Reis v. State*, 88 N.E.3d 1099, 1101-02 (Ind. Ct. App. 2017). The question under Appellate Rule 7(B) analysis is "not whether another sentence is *more* appropriate" but rather "whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Whether a sentence is inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224.

[38] We begin with the advisory sentence in determining the appropriateness of a sentence. *Childress*, 848 N.E.2d at 1081. The advisory sentence for a Level 1 felony is thirty years, with a minimum sentence of twenty years and a maximum sentence of fifty years. Ind. Code § 35-50-2-4(c). Thrash was sentenced to forty years for each count, ten years longer than the advisory sentence but ten years shorter than the maximum sentence.

## B. Nature of the Offenses

[39] Not surprisingly, Thrash has not offered an argument regarding the nature of his offenses, but they are egregious. At the sentencing hearing, evidence was

presented regarding allegations of Thrash engaging in improper behavior toward S.D. while S.D., her mother, her brother, and Thrash lived in Georgia, and when S.D. would have been eight or nine years old. A Marion Police Department detective, who investigated the claims that Thrash molested S.D. in Marion, Indiana, learned during his investigation that in February 2016 (approximately five months before the family moved to Indiana), S.D. had disclosed to her mother and a school official that Thrash had been molesting her in Georgia, and that she had provided a statement regarding the molestations to a child advocacy center in Georgia. As a result of an investigation, Hand signed a safety plan with the Georgia Department of Family Services that prohibited Thrash from "being around" S.D. Tr., Vol. 3 at 107. Nevertheless, Thrash moved with the family to Indiana.

[40] In Indiana, and in both residences in which the family lived, Thrash, who was in a position of having care and control of S.D., repeatedly subjected S.D., then ten years old, to sexual intercourse—in nearly every room, bed, and couch in the houses—and at times, would ejaculate inside of her. *See McCoy v. State*, 856 N.E.2d 1259, 1262 (Ind. Ct. App. 2006) (stating that a position of trust "by itself constitutes a valid aggravating factor, which supports the maximum enhancement of a sentence for child molesting"); s*ee also Hamilton v. State*, 955 N.E.2d 723, 727 (Ind. 2011) (stating that "[t]he younger the victim, the more culpable the defendant's conduct"). Thrash never used condoms, and he eventually impregnated S.D. When S.D. described the molestations to the

interviewer at the Indiana child advocacy center, she told the interviewer that Thrash "raped me." Tr., Vol. 2 at 176.

[41]     When Hand learned that S.D. was pregnant, she took her to an abortion clinic to have the baby aborted. S.D., now eleven years old and not understanding what an abortion clinic was, learned about the clinic by watching videos on YouTube. S.D. gave birth to what appeared to be a healthy baby boy, but during her pregnancy, she developed gestational diabetes and minor pre-eclampsia.

[42]     Approximately one month after giving birth, S.D. began to experience severe behavioral, emotional and mental health issues. She testified as follows at sentencing:

> At the age of eight, my life changed. As a result of this change, I have experienced a number of emotional and behavioral difficulties, and I've also experienced the pain of separation from my family especially my mom, my brother and my son. These changes have impacted my life a lot in the past four years, and I want to explain a little more what my impact looked like. I went [from] a happy, positive, cheerful person to a depressed, negative and unhappy person and I once had a childhood, but I often tell myself I want my childhood back, but I am stuck with the reality that I can never get it back. What happened to me has changed the way I view myself, others in the world. I've questioned why someone who is supposed to love me and be my father would do this to me, and it hurts to get raped by the ones who "love" you. I was afraid to tell him because my whole life was shattered, and I felt like I was going to get hurt, and even when I tried speaking up no one would listen in my family. My life has been a roller coaster of experiences spiraling out of control. I have self-

harmed to numb the pain, anger, outbursts and fighting because I can't communicate how I feel inside. Running away to escape my pain. Substance abuse to express my feelings. Getting in trouble at school and involvement in unhealthy relationships. I did these things to try to escape my own living hell. Despite all of this, I am determined to gain back a life of happiness, positivity and cheerfulness. Although I can't get my childhood back, I will gain a successful and [sic] teenage and adult life. I am receiving therapy to help me learn to express my thoughts and feelings in healthier ways, manage my emotions better, improve my self-esteem, positive and healthy interactions with others and process through the negative impacts of my trauma, successfully overcome the past. I've been successful in treatment, and I have significantly decreased my self-harm behaviors, and I will continue to work towards to [sic] my goals in treatment. My favorite quote tells me is each day of "life is tougher but I am tougher". Thank you for my time.

Tr., Vol. 3 at 111-12. Given the nature of the offenses, we find that Thrash's lengthy sentence is not inappropriate.

## C. Character of the Offender

As to his character, Thrash argues that he is a high school graduate; he has prior criminal history but no previous arrests for child molesting or sexual misconduct with a minor child; his previous incarcerations have been for short periods of time; he has a good relationship with his father, mother, and sister; prior to his incarceration, he was employed; he attends church services every Sunday; and he was categorized as having a moderate risk to reoffend on the

Indiana Risk Assessment tool.[6]  We are unpersuaded that his character warrants a reduction of his sentence.

[44]  At thirty-four years old, Thrash had fathered nine children and was not current on his child-support payments.  He has a criminal history that began in 2000 and continues to present.  His Georgia offenses include: a conviction for theft by receiving stolen property in 2001; in March 2005, he committed Giving False Name, Address, or Birthday to Law (a misdemeanor); in September of that year, before his false-identity case was disposed, he committed misdemeanor criminal trespass and felony criminal damage to property; in 2011, he committed and was later convicted of burglary; and, in 2012, he was charged with and convicted of theft and battery.  He was placed on probation five times, and petitions to revoke his probation were filed in two of his cases.  His pre-sentence investigation report indicated that he would be considered a flight risk because he fled from Georgia and traveled to Indiana while on probation and while under investigation in Georgia for allegations of child molesting.

[45]  As for Thrash's behavior at trial, Thrash knew that an order in limine had been granted and that evidence that (1) S.D.'s cousin had touched her in the past, in Georgia, and (2) that S.D.'s foster father was being investigated for inappropriate conduct with S.D. could not be introduced.  Nevertheless, Thrash

---

[6] Due to the nature of the instant offenses, an override was completed on the Indiana Risk Assessment tool, and Thrash was re-categorized as having a high risk to reoffend.

violated the order during voir dire by attempting to communicate to the jury, both verbally and by displaying a handwritten sign, that S.D. was sexually promiscuous in Georgia. After being admonished by the trial court, repeatedly warned that further violations would result in his removal from the courtroom, and advised by his counsel, Thrash again intentionally violated the order while testifying in his own defense, when he attempted to convey the same slanderous allegations to the jury.

[46] His defense at trial was that he did not have sexual relations with S.D. and that it was Hand who impregnated S.D., using Thrash's semen that she collected from condoms used when Hand and Thrash had sex. The jury did not believe Thrash's version of events. At sentencing, Thrash painted himself as a "victim[,]" alluded to "four more victims[,]" and continued to denigrate S.D., stating:

> I am not the only victim. There was four more victims. Even since I've been locked up there been another victim, the foster parent of the foster place that she moved into, same charges I have, sexual abused [sic], manipulated. So[,] I just wanna make that clear that they said she was going through counseling or whatever. All this emotional stress and everything they put out and wanted to look like I was the reason because there was another case after me since I've been in here. So[,] you can't put it like I'm the reason that she's going through so much psychiatric help and all that. Even before me there was cases, grown men. Let the record reflect so that you know. I mean, maybe it don't sound too good. I ain't trying to make it look good. I'm just saying if, if you gonna look at me as I need help, then you need to look at her as she need help. You know what I'm saying? It ain't just, it wasn't all me. There's been three,

four other grown men.  A couple before me, even after since I been locked up in jail.  Sleeping with a married woman's husband of your foster care.  You do something over and over and over and over it becomes a habit.  What about the next person?  What's gonna happen to them if ain't nothing being done to stop it?  I'm number three.  It is a number a four.  That's in Fort Wayne right now.  That's the foster care parent.  That's four.  What happens with the fifth person?  Do they just keep going?  Do it stop?  Just for the record.  I ain't [sic] nothing else to say.

Tr., Vol. 3 at 114-15.  In his appellant's brief, Thrash places partial blame on Hand, suggesting that Hand "bears a significant amount of responsibility for the impact [the circumstances of this case] had on [S.D.]" because she "became aware of the allegations of improper conduct while living in Georgia[,]" but "failed to take steps to protect her daughter."  Appellant's Br. at 34.

[47]   Thrash's criminal history, his courtroom antics, his disparaging allegations against S.D., and his attempts to place blame on Hand all reflect poorly on his character.  We find that Thrash's character does not warrant a reduction in his sentence.

[48]   Although Thrash's sentence is one of the lengthiest sentences imposed in Indiana for the molestation of a single child victim, nothing about the sentence is inappropriate given the nature of the offenses and his character.  As noted by this court in *Ludack v. State*, 967 N.E.2d 41, 49-50 (Ind. Ct. App. 2012) (affirming 130-year sentence for conviction of two counts of Class A felony

child molesting, and habitual offender adjudication, involving one victim),

*trans. denied*:

> We acknowledge that "[w]hether the counts involve one or multiple victims is highly relevant to the decision to impose consecutive sentences." *Cardwell*, 895 N.E.2d at 1225. However, the *Cardwell* court also noted that "additional criminal activity directed to the same victim should not be free of consequences." 895 N.E.2d at 1225. The cases in which our supreme court revised consecutive sentences to concurrent sentences where the child molesting charges involved the same victim are easily distinguishable. *See Pierce v. State*, 949 N.E.2d 349, 352-53 (Ind. 2011) (revising one-hundred-thirty-four-year aggregate sentence to eighty-year aggregate sentence where defendant's criminal history included only one prior class C felony molestation conviction that occurred eight years before instant offense); *Rivers v. State*, 915 N.E.2d 141, 144 (Ind. 2009) (revising consecutive sentences to concurrent sentences where defendant molested victim on two occasions in a relatively short period of time, then stopped on his own accord, and did not commit any other offenses in the seven years that passed until he was charged); *Harris v. State*, 897 N.E.2d 927, 930 (Ind. 2008) (revising consecutive fifty-year sentences to concurrent sentences where defendant's criminal history consisted of two class D felonies involving theft and numerous traffic violations, which court concluded were not significant aggravators in relation to class A felony child molestation); *Smith v. State*, 889 N.E.2d 261, 263-64 (Ind. 2008) (revising four consecutive sentences to three concurrent sentences and one consecutive where defendant's criminal history was assigned low aggravating weight due to lack of proximity in time between prior offenses and instant offenses and his mental health (history of depression and two suicide attempts) was a mitigating factor); *Monroe v. State*, 886 N.E.2d 578, 580-81 (Ind. 2008) (revising consecutive twenty-two-year sentences on five counts of class A felony child molesting to fifty-year concurrent sentences where defendant's criminal history of

six misdemeanor convictions was assigned little aggravating weight); *Ortiz v. State*, 766 N.E.2d 370, 377 (Ind. 2002) (revising consecutive thirty-year sentences to concurrent terms where trial court failed to adequately identify, explain, and evaluate aggravating circumstances used to impose consecutive sentences); *Walker v. State*, 747 N.E.2d 536, 538 (Ind. 2001) (revising two consecutive forty-year sentences to run concurrently where defendant did not have history of criminal behavior).

[49] Thrash had sexual intercourse with S.D. over a period of months and possibly years. He robbed a young, innocent girl of her childhood and forced her to experience things that no child should experience, especially one as young as S.D. He caused her to conceive a child at age ten, give birth at age eleven, suffer complications as a result of the pregnancy, and suffer mental and behavioral problems from the trauma of giving birth at such a young age, including depression and self-harming. Throughout his trial (and in violation of an order in limine), and during sentencing, Thrash attempted to malign the victim and paint her as sexually promiscuous. Under these facts and circumstances, we cannot conclude that Thrash's 160-year sentence for ten counts of Level 1 felony child molesting is inappropriate in light of the nature of his offenses and his character. We decline to revise it under Appellate Rule 7(B).

# Conclusion

[50] In conclusion, the trial court did not abuse its discretion by removing Thrash from the courtroom for the remainder of his trial or admitting into evidence

photographs of S.D. and her baby, and Thrash's sentence is not inappropriate given the nature of the offenses and his character.

[51]     Affirmed.

Baker, J., and Najam, J., concur.