# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 07 2018, 10:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeremy K. Nix
Huntington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Zachary L. Lewis, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 7, 2018 <br><br> Court of Appeals Case No. 35A02-1709-CR-2130 <br><br> Appeal from the Huntington Circuit Court <br><br> The Honorable Thomas M. Hakes, Judge <br><br> Trial Court Cause No. 35C01-1701-F5-7 |

**Barnes, Judge.**

# Case Summary

Zachary Lee Lewis appeals his conviction and sentence for Level 5 felony battery on a pregnant woman and for being an habitual offender.[1] We affirm.

# Issues

Lewis raises the following issues on appeal:

    I.      whether the trial court abused its discretion by admitting Facebook messages purportedly sent by Lewis without proper foundation; and

    II.     whether his sentence is inappropriate.

# Facts

In January 2017, Lewis and his then-girlfriend, J.W., lived in Huntington. J.W. was nearing her ninth month of pregnancy.[2] The pair planned to raise J.W.'s child together. Shortly after midnight on January 18, 2017, Lewis and J.W. argued. J.W. ended the relationship and asked Lewis to leave her family's home, where they resided.

---

[1] The pre-sentence investigation report states Appellant's legal name as "Zachery Lee Lewis," with "Zachary Lee Lewis" listed among his aliases.

[2] Trial testimony revealed that Lewis was aware of J.W.'s pregnancy. He told the police that "the baby's not his, but he treats it as [if] it is his." Tr. Vol. II p. 235. J.W.'s mother later testified that J.W. had a high-risk pregnancy.

[4]     Around midnight the following day, Lewis telephoned J.W. from the St. Joseph's Burn Center in Fort Wayne. He claimed that he was stabbed and that his truck, keys, and money were stolen. He asked J.W. for a ride to Huntington. In the early morning hours of January 19, 2017, J.W. borrowed her mother's car and drove to Fort Wayne to pick Lewis up. As J.W. drove Lewis back to Huntington, he gave a rambling account of the events leading up to his telephone call. J.W. demanded to see proof that he was injured. Seeing none, she reiterated that she was done with their relationship.

[5]     Lewis then hit J.W. in the face and abdomen multiple times with an open hand and with his fist. When J.W. tried to pull over, Lewis grabbed the steering wheel and forced the vehicle back onto the road, veering toward an oncoming semi-truck. J.W. eventually stopped the vehicle and asked why Lewis was hitting her. Lewis said, "B****, keep going or I'm gonna do worse." Tr. Vol. II p. 73. Lewis continued to hit J.W., despite her pleas that he was hurting her and might harm her baby. J.W. begged Lewis to leave the vehicle, but he refused. J.W. managed to exit the vehicle, ran across the street amid traffic, and tried to flag down passing motorists. Lewis chased J.W., grabbed her, and dragged her back across the median toward the vehicle. She dropped to the ground in an effort to pull away and curled into a fetal position in a roadside ditch. While she was on the ground, Lewis beat her face and abdomen multiple times. J.W. screamed, "Please stop, you're gonna hurt the baby, I can't feel her," and "you're gonna kill her, you're gonna kill the baby, please just stop[.]"

*Id.* at 75. Lewis finally stopped hitting J.W. when she screamed, "[Y]ou're hitting the baby! I can't feel the baby!" *Id.*

[6] Lewis apologized and asked J.W. to hug him. He urged her to get back into the vehicle, to drive them home and to keep the attack a secret. Instead, J.W. ran to a nearby house for help. When no one answered, she ran behind the house. Lewis drove up to the house, and leaving the vehicle running, began to search for J.W. When an opportunity presented, J.W. ran to the vehicle and drove home. When she arrived at home, she was "bloody and . . . hysterical[.]" *Id.* at 196. Her family called the police.

[7] Officer Landon Sell of the Huntington City Police Department was dispatched to J.W.'s family's house. J.W. was "frightened, sobbing, [and] . . . very concerned about her unborn child." *Id.* at 209. "She had wounds to her face[,] some dried blood [and] cuts that were actively bleeding." *Id.* at 210. Officer Sell photographed her injuries.

[8] Later that day, at approximately 3:30 P.M., Lewis sent multiple messages to J.W. via Facebook Messenger. Lewis had two Facebook accounts and kept one of his passwords secret. Investigators photographed the following Facebook message exchange on J.W.'s cell phone:

> [Lewis]: I need clajdios [sic] number
>
> [J.W.]: He is locked up
>
> [Lewis]: Yo u want me to cpme [sic] over?

[J.W.]:  U can't.  [Lewis] u hurt me bad and they can't keep the baby's heartbeat it's on n off.  Dcs is involved

[Lewis]:  It's me turkey

[J.W.]:  Why did you snap on me.  Why did u hurt me n keep hitting me n hit my belly.  Why

[Lewis]:  Sleeping with one of my brothh rs [sic]

[J.W.]:  I didn't I swear to god I didn't

[Lewis]:  Well im going to fort waybne [sic]

[J.W.]:  They r looking for [you].

[Lewis]:  Who?

[J.W.]:  Cops dcs parole.

[Lewis]:  Y?

[J.W.]:  BC [because] they took me to the hospital[.]  They pulled me over.  They dont [sic] know if imma lose the baby BC of u[.]  Dcs was gonna take [child A.] BC of u

[Lewis]:  I dont [sic] remember what hapoened [sic]

[J.W.]:  U beat the hell out of me.  U punched the hell out of my belly.

[Lewis]:  * * * No I didnt [sic]

[J.W.]:  Yea u did I have marks they took pictures there is blood all over moms car.  My clothes everything

[Lewis]:  Stop your [sic] freaking me out

[J.W.]:  No u did [Lewis]. I kept begging u to stop and u ton [sic] the car n my keys n I ran from u.  To a house n beat on there [sic] door.  They called the cops.

[Lewis]:  I lost everything[.]  I dont [sic] remember [sic] where I put anything

[J.W.]:  Idk [I don't know] all I know is im in so much pain everyone hates me BC of u and all I did was try n help u get home.  Im bout [sic] to lose my kids BC of u

[Lewis]:  What am i supposed to do

[J.W.]:  I told u stay off the drugs.  If I dint [sic] get away u would of [sic] killed . . . [m]e

[Lewis]:  You have beaten me

[J.W.]:  I can't talk to u.  They will take my kids.  And u started.  Beating me for no reason.  And no i haven't.  I tried.  To get away from u.

[Lewis]:  And i would never do anyythinh [sic] to take you away from your family

[J.W.]:  U did last night dcs was gonna take [child A.] from me. N u damn near killed the baby from hitting me.  U need to get help [Lewis] and I can't do it.  They r putting a protective order

where u can't see us or be around us nothing. Im sorry I gotta go
please get help before u hurt someone else or hurt urself. Ur a
damn good man n person when ur off of drugs. U need help we
can't talk im not losing my kids. Bye.

Ex. 1-7.

[9] On January 19, 2017, the State charged Lewis with battery on a pregnant woman and criminal confinement, as Level 5 felonies, and with being an habitual offender. On July 25-27, 2017, he was tried by a jury. J.W. testified that Lewis communicated with her via Facebook Messenger before and after the attack; that she had helped Lewis to set up a Facebook account; that Lewis could log into his account from any cell phone or computer; and that she had no reason to doubt that the post-attack Facebook messages were authored by Lewis because the exchange included: (1) Lewis' longtime inside joke with her mother; (2) his request for their mutual friend Claudio's contact information; (3) references to the attack—including Lewis' denial that he struck her; his claim that he did not recall the events; and his claim that he had lost his keys and truck; and (4) references to their troubled relationship, including Lewis' claims that J.W. had previously struck him and that she had sex with one of his brothers. The trial court admitted the Facebook messages into evidence over Lewis' continuing objections. The State also introduced recordings of Lewis' jailhouse telephone calls to J.W., in which he professed his love, urged her to recant her statements to police, and to lie under oath at trial.

[10] Throughout his testimony, Lewis admitted on multiple occasions that he initiated and authored the Facebook messages to J.W. *See* Tr. Vol. III p. 95 ("[Y]es, I contacted [J.W.] on Facebook, Instant Messenger."); *id*. at 130-31, 137, 153. He offered up an alternate interpretation for the conversation, maintaining that he was merely sending messages of "concern" and to see "if she needed something, needed help or something" after their breakup. *Id*. at 96, 97. He testified that he never intentionally struck J.W. and that he initially misread J.W.'s messages as merely accusing him of hurting her "emotionally." *Id*. at 97. He testified that he was "completely confused with all these text messages" and "tired of the lies" and "done with her drama" and "[h]er trying to push something off on me . . . that I didn't do." *Id*. at 106, 108. He testified that he was reluctant to cooperate with police because he did not want J.W. to be arrested for battering him.

[11] At the close of the evidence, the jury returned a guilty verdict on the battery offense and not guilty of criminal confinement. Lewis subsequently admitted to being an habitual offender. At his sentencing hearing on September 11, 2017, correctional officer Todd Spillman of the Huntington County Jail testified that, since Lewis' incarceration, jail officials had to lock him down and segregate him for threats against correctional officers and for physical violence against a fellow inmate. The trial court imposed a five and one-half year sentence for the battery and enhanced that sentence by five years because Lewis was an habitual offender, for an aggregate sentence of ten and one-half years. The trial court found that Lewis' significant criminal history—including numerous prior

battery convictions—was an aggravating circumstance and found no mitigators. He now appeals.

# Analysis

## I. *Admission of Evidence*

[12] Lewis argues that the trial court erred in admitting Facebook messages which he alleges were not properly authenticated and, therefore, lacked a proper foundation. "The trial court has discretionary power on the admission of evidence, and its decisions are reviewed only for an abuse of that discretion." *Lewis v. State,* 34 N.E.3d 240, 247 (Ind. 2015). An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts and circumstances. *Nicholson v. State,* 963 N.E.2d 1096, 1099 (Ind. 2012).

[13] "'A claim of error in the exclusion or admission of evidence will not prevail on appeal unless the error affects the substantial rights of the moving party.'" *Id.* (quoting *McCarthy v. State,* 749 N.E.2d 528, 536 (Ind. 2001)). Even if the trial court abused its discretion in admitting evidence, the judgment will be undisturbed if the decision to admit evidence is harmless. *Bowman v. State*, 73 N.E.3d 731, 734 (Ind. Ct. App. 2017), *trans. denied*. "Harmless error occurs 'when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction.'" *Id*. (quoting *Lafayette v. State*, 917 N.E.2d 660, 666 (Ind. 2009)).

"To lay a foundation for the admission of evidence, the proponent of the evidence must show that it has been authenticated." Indiana Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Absolute proof of authenticity is not required. Rather, the proponent of the evidence must establish only a reasonable probability that the evidence is what it is claimed to be, and may use direct or circumstantial evidence to do so. Once this reasonable probability is shown, any inconclusiveness of the evidence's connection with the events at issue goes to evidential weight, not admissibility.

"Letters and words set down by electronic recording and other forms of data compilation are included within Rule 901(a)." Moreover, Evidence Rule 901(b) provides a non-exhaustive list of evidence that satisfies the authentication requirement. One example is where there is evidence describing a process or system and showing that it produces an accurate result. Evid. R. 901(b)(9). Another example, provided in Evidence Rule 901(b)(4), is where, taken together with all the circumstances, the evidence has distinctive characteristics in appearance, contents, or substance. Federal Rule of Evidence 901(b)(4) uses language identical to that of Indiana Rule of Evidence 901(b)(4). "We have previously acknowledged that federal courts have recognized Federal Rule of Evidence 901(B)(4) as one of the most frequently used means to authenticate electronic data, including text messages and emails." *Wilson* [*v. State*], 30 N.E.3d 1264,] 1268 [(Ind. Ct. App. 2015).].

*Richardson v. State,* 79 N.E.3d 958, 962 (Ind. Ct. App. 2017) (internal citations and quotations omitted).

[14]   In *Wilson*, during the defendant's murder trial, the trial court allowed his Twitter posts referencing his gang affiliation and his possession of handguns comparable to the murder weapons to be admitted into evidence over his objection. In affirming the judgment, we rejected Wilson's claim that the State had failed to provide sufficient foundation to authenticate the Twitter messages as being authored by him. We found that "witness testimony identifying the Twitter account as belonging to Wilson and the content of the account, including pictures and gang references[,]" were "more than sufficient to authenticate the Twitter posts as being authored by Wilson." *Wilson*, 30 N.E.3d at 1269.

[15]   Here, J.W. testified that after the attack—as he had before—Lewis contacted her "[t]hrough Facebook Messenger." Tr. Vol. II p. 85. J.W. testified that Lewis typically used Facebook Messenger on his cell phone and that she had "helped him set [his Facebook Messenger account] up." *Id*. at 89. She testified further that, in his post-attack Facebook messages, Lewis asked her for Robert Claudio's phone number; she explained that Claudio was "a very good friend of mine" and "he's friends with [Lewis]." *Id*. at 91. She also testified that the messages included the phrase, "It's me, turkey," which was "what [Lewis] used to say to [her] mom when he would walk into the house." *Id*. at 93. J.W. also testified that the messages referenced Lewis' long-held suspicion that she had sex with one of his brothers. Elsewhere in the exchange, J.W. testified that she and Lewis exchanged messages in which she told Lewis that a no-contact order was in effect; expressed her fear that his attack might prompt DCS to take her

children; and warned him to stay off drugs. J.W. testified that Lewis replied by denying that he had attacked her and alleging that she had previously initiated physical violence in their relationship. J.W. also testified that the sender stated, "I lost everything. I don't remember where I put anything[,]" which recalled Lewis' initial ruse that he needed a ride because he could not find his keys, truck, or money. Ex. 5. Lastly, J.W. testified that nothing about the Facebook exchange led her to believe that she was conversing with anyone but Lewis.

[16] Based on the foregoing, we conclude as in *Wilson*, that the State established a reasonable probability that the Facebook messages were what the State claimed them to be. *See Richardson,* 79 N.E.3d at 962. Specifically, witness testimony, including Lewis' own admissions, and multiple instances of corroborative content were more than sufficient to authenticate the Facebook messages as being authored by Lewis. *See Wilson*, 30 N.E.3d at 1269. The trial court did not abuse its discretion in admitting the Facebook messages into evidence. Error, if any, from the admission of the messages into was harmless, given Lewis' testimony that he authored them. *See Bowman*, 73 N.E.3d at 734.

## II. Sentence

[17] Next, Lewis argues that his sentence is inappropriate. Indiana Appellate Rule 7(B) provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offenses and the character of the offender. When considering whether a sentence is inappropriate, we need not be "extremely" deferential to a trial court's sentencing decision. *Rutherford v.*

*State,* 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). Still, we must give due consideration to that decision. *Id*. We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id.* Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006).

[18] The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). We "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id.* When reviewing the appropriateness of a sentence under Rule 7(B), we may consider all aspects of the penal consequences imposed by the trial court in sentencing the defendant, including whether a portion of the sentence was suspended. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010).

[19] Here, the trial court imposed a five and one-half year sentence for Lewis' Level 5 felony battery conviction and enhanced that sentence by five years because he was an habitual offender, for an aggregate sentence of ten and one-half years. The trial court ordered the entire sentence to be executed in the Department of Correction. Under Indiana Code Section 35-50-3-6, a person convicted of a Level 5 felony "shall be imprisoned for a fixed term of between one (1) and six

(6) years, with the advisory sentence being three (3) years." Indiana Code Section 35-50-2-8 provides that a court "shall sentence a person found to be a[n] habitual offender to an additional fixed term that is between: . . . two (2) years and six (6) years, for a person convicted of a Level 5 [felony]." In imposing a ten and one-half year sentence, the trial court stopped short of imposing the twelve-year maximum allowable sentence. Lewis argues that his sentence is inappropriate.

[20] Regarding the nature of the offense, after luring J.W. under false pretenses to come to his aid and knowing in the midst of a high-risk pregnancy, Lewis repeatedly struck her face and abdomen with his open hand and fist, injuring her. When J.W. tried to escape him, he chased her into traffic, dragged her back to her vehicle, and punched her face and abdomen as she lay on the ground in a fetal position. He struck her with such force that the steering wheel, console, and driver's side window of her vehicle were spattered with blood. When she reached safety, she was bleeding from her nose, mouth, and from open cuts, her lip was split, and she feared that she had lost her baby.

[21] As for Lewis' character, the record reveals that after he attacked J.W., he begged her to pretend that the incident never happened; denied any recollection of the events; accused her of being the aggressor; and placed multiple jailhouse calls to J.W., in which he professed his love, urged her to recant her statements to police, and to lie under oath at trial. Additionally, Lewis has a significant criminal history, including numerous battery convictions. Now thirty-two years of age, Lewis has been involved with the criminal justice system since he was

approximately fourteen years old. The pre-sentence investigation report reveals that Lewis has misdemeanor and felony convictions for intimidation in 2011; three convictions for disorderly conduct in 2011, 2013 and 2016; and misdemeanor and felony convictions for battery in 2001, 2004, 2009 (two times), 2010, 2011, 2013, 2014, 2016, and 2017. His multiple contacts with the criminal justice system and court-ordered participation in treatment programs for aberrant behavior, anger issues, and substance abuse have not deterred him whatsoever, to the point that he escalated here to attacking a pregnant woman in public. Given the viciousness of Lewis' attack on J.W., his extensive criminal history—including his propensity for physical violence—and his inability to correct his behavior, we cannot say that his sentence is inappropriate.

## Conclusion

[22] The trial court did not abuse its discretion by admitting Lewis' Facebook messages, and we cannot say that his sentence is inappropriate. We affirm.

[23] Affirmed.

Najam, J., and Mathias, J., concur.