

IN THE

# Court of Appeals of Indiana

Kristofer Polk,

*Appellant-Defendant*



FILED

Oct 10 2025, 9:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

State of Indiana,

*Appellee-Plaintiff*

---

October 10, 2025

Court of Appeals Case No.
25A-CR-391

Appeal from the Marion Superior Court

The Honorable Marie L. Kern, Judge

Trial Court Cause No.
49D28-2307-F1-21515

---

**Opinion by Judge Mathias**
Judge Bradford concurs.
Judge May concurs in result with separate opinion.

**Mathias, Judge.**

[1] Kristofer Polk appeals his two convictions for Level 1 felony dealing in a controlled substance as well as his adjudication as a habitual offender. Polk raises two issues for our review, which we restate as follows:

> 1. Whether the trial court abused its discretion when it admitted into evidence the entirety of one victim's cell phone usage data— nineteen gigabytes of data across more than 100,000 individual files—to establish a foundation for specific text messages and location data from the same cell phone.

> 2. Whether the State presented sufficient evidence to support Polk's convictions.

[2] We hold that the trial court's admission of the entirety of the victim's cell phone usage data into the record was an abuse of the trial court's discretion. However, as we conclude that that error had no impact on the trial court finding Polk guilty and that the State presented sufficient evidence to support Polk's convictions, we affirm.

## Facts and Procedural History

[3] In the late evening hours of May 22, 2023, Roberto Hernandez-Concepcion texted Polk and asked Polk to bring $50 worth of cocaine to Roberto at Roberto's Indianapolis residence. The two texted back and forth for some time; Roberto repeatedly asked where Polk was while Polk repeatedly said he was on his way. A little more than an hour after Roberto's first text, Roberto texted Polk again and said, "we want it now." Ex. Vol. p. 51. Shortly after that text

and for about five minutes, Polk's cell phone location data showed that he was near Roberto's residence.

[4] Around 5:00 a.m. on May 23, Adrianna DeJesus-Wise, Roberto's fiancée, went to Roberto's residence after she got off work. Upon arriving, she found Roberto and one of his acquaintances, Danilo Martinez-Gonzalez, deceased in the driveway. A second acquaintance in front of the house was breathing but appeared to be near death. And Adrianna found a third acquaintance inside the residence; he was "in and out of consciousness." Tr. Vol. 2, p. 73. Adrianna contacted law enforcement officers, and, inside the residence, investigating officers located a plate near the kitchen that had white residue on it with a rolled-up dollar bill and a plastic credit card nearby. The area looked as if "someone [wa]s using cocaine." *Id.* at 153.

[5] But the white substance was not cocaine; it was fentanyl. Fentanyl looks like cocaine, and dealers often cut cocaine with fentanyl because fentanyl is cheaper than cocaine, and, by blending the two together, the dealer makes more profit. While cocaine is commonly snorted, fentanyl is more commonly injected intravenously. There was no evidence found inside Roberto's residence of intravenous drug use, and no cocaine was identified on the plate with the fentanyl. An ensuing autopsy revealed that ingestion of fentanyl had contributed to the death of Roberto and Danilo. No cocaine was identified in the toxicology results.

[6] Investigating officers located Roberto's cell phone, which led them to Polk. Officers eventually located Polk and seized his cell phone. On Polk's phone, they found the matching conversation to the text messages on Roberto's phone regarding the deal for cocaine hours before Roberto's death. Officers also obtained Polk's cell phone location data, which showed him near Roberto's residence late on May 22. At some point, officers downloaded the entire contents of Roberto's cell phone, which consisted of nineteen gigabytes of data with 194 folders and 112,800 individual files,[1] onto a flash drive in what is described in the record as the "phone dump" data. *Id.* at 165.

[7] The State charged Polk with two counts of Level 1 felony dealing in a controlled substance, which counts were enhanced based on the deaths of Roberto and Danilo. The State also alleged Polk to be a habitual offender.

[8] At Polk's ensuing bench trial, the State sought to have the flash drive with the entirety of Roberto's cell phone data admitted into evidence to establish the foundation for text messages from Roberto's phone to Polk on the evening of May 22 as well as Roberto's cell phone location data. In doing so, Indiana Counter Drug Task Force Officer Brian Roell testified that he had specialized training in extracting and analyzing cell phone data. He testified that he was familiar with Roberto's cell phone, that he had extracted the contents of that phone and placed the entirety of that data onto the flash drive, and that he had

---

[1] Polk represents in his brief to our Court that, in .pdf format, the flash drive's contents would be the equivalent of more than 35,000 pages.

then reviewed the flash drive's contents to ensure that they accurately copied the data from Roberto's phone. The State then sought to admit the flash drive as State's Exhibit 26.

[9] Polk objected to the admission of the flash drive on the ground that it was "a mountain of data . . . , 99 percent of which is not relevant." *Id.* The State responded that it needed the flash drive to establish the foundation for the upcoming, data-specific exhibits regarding Roberto's text messages and cell phone location data. Although the trial court made clear that it was "not going fishing in the flash drive," the trial court admitted the flash drive into the record. *Id.* at 174. The trial court then also admitted into evidence, without objection, the text messages between Roberto and Polk, and related extraction reports, from Roberto's phone as State's Exhibits 27, 28, and 29. And the trial court admitted into evidence, again without objection, Roberto's cell phone location data as State's Exhibit 43. State's Exhibits 27, 28, 29, and 43 were all admitted during Officer Roell's testimony in which he confirmed that those exhibits were consistent with data extracted from Roberto's phone.

[10] Following the close of evidence, the trial court found Polk guilty as charged. The court then entered its judgment of conviction and sentenced Polk to an aggregate term of fifty-one years in the Department of Correction. This appeal ensued.

## 1. The trial court abused its discretion when it admitted the entire contents of Roberto's cell phone into the record.

On appeal, we first address Polk's argument that the trial court abused its discretion when it admitted State's Exhibit 26 into evidence.[2] We review the trial court's decision to admit or to exclude evidence for an abuse of discretion. *See, e.g.*, *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). "An abuse of discretion occurs when the court's decision either clearly contravenes the logic and effect of the facts and circumstances" before it, or the court "misinterprets the law." *Nardi v. King*, 253 N.E.3d 1098, 1103 (Ind. 2025) (quotation marks omitted).

In State's Exhibit 26, the State offered the entirety of Roberto's cell phone data as a flash drive containing nineteen gigabytes of data across 194 folders and 112,800 individual files. The State offered the exhibit purportedly to establish a foundation to the State's ensuing, data-specific exhibits that showed Roberto's text messages from that phone with Polk and Roberto's cell phone location data on May 22 and 23. And, while it admitted State's Exhibit 26 into the record, the

---

[2] The State does not address Polk's argument in its brief, and, instead, it asks that we avoid the issue because Polk concedes that any error here was harmless. We decline to avoid the issue for two reasons. First, the issue has been properly preserved and raised on appeal, and a party's concession in a brief is not binding on our Court in our own assessment of the law and the facts. *See, e.g.*, *Berg v. State*, 45 N.E.3d 506, 508 (Ind. Ct. App. 2015) (rejecting the State's concession of a double jeopardy violation). Second, Indiana's appellate courts routinely address the merits of a claim of error in the admission of evidence before then proceeding to discuss, as necessary, whether any such error is harmless. *E.g.*, *Hayko v. State*, 211 N.E.3d 483, 491 (Ind. 2023). We follow that routine practice here.

trial court made clear that it was not going to go "fishing" through the flash drive to confirm the State's foundation theory. Tr. Vol. 2, p. 174.

[13] State's Exhibit 26 was unnecessary to establish a foundation for the State's ensuing, data-specific exhibits showing Roberto's text messages and cell phone location. To establish the foundation for the more specific exhibits, the State needed to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(a). One method of doing so is through the testimony of a "witness with knowledge" that the "item is what it is claimed to be." Evid. R. 901(b)(1).

[14] Officer Roell's testimony was sufficient to establish a foundation for the data-specific exhibits without any reference to the flash drive. Officer Roell testified that he had specialized training in cell phone data extraction and analysis and that he was familiar with Roberto's phone and its contents. He also testified that the data-specific exhibits revealed data extracted from Roberto's phone. That testimony sufficed to establish a foundation for the data-specific exhibits. *Id.* State's Exhibit 26 thus had no role to play in establishing a foundation for the data-specific exhibits and instead simply added voluminous surplusage to the record that was unreasonable and unnecessary. By way of analogy, using the entire contents of someone's cell phone to establish a foundation for some text and location data is like using decades of someone's tax returns to establish a foundation for one IRS Form 1040. Further, admitting such voluminous

information into the record creates unreasonable risks of public access to potentially sensitive yet irrelevant data.[3]

[15] We acknowledge the separate opinion's concern that cell phone contents may provide important "context surrounding specific communications . . . necessary to prove . . . authenticity" of exhibits. *Infra* p. 15. And we reiterate that our trial courts have broad discretion in discerning the line between context and surplusage, and there may well be any number of reasonable reasons why a trial court may err on the side of some surplusage to ensure the evidence presented is in its full and proper context. But State's Exhibit 26 was not within the realm of any such reasonable discretion; State's Exhibit 26 invited the fact-finder to rummage through a person's entire cell phone history with no concern for how that history might be probative to a fact of consequence. While the fact-finder here was a judge who clearly stated his intention not to review the contents of the flash drive, unfettered review by a jury could be exceedingly prejudicial. Accordingly, we conclude that the trial court erroneously admitted State's Exhibit 26 into the record.

---

[3] The computer program used to extract Roberto's cell phone data was developed by Cellebrite, a well-known forensic software developer whose products are used by law enforcement agencies throughout the United States. According to information readily available on its website, a current version of its program includes a feature to retrieve cell phone information, like the texts and location data at issue here, in a date-limited report. This feature allows both warrants and evidence obtained through those warrants to be properly limited to legally admissible evidence. *See* Heather Mahalik, Different Methods for Creating Reports in Cellebrite Reader, Cellebrite.com (Mar. 9, 2022), https://cellebrite.com/en/different-methods-for-creating-reports-in-cellebrite-reader/ [https://perma.cc/DBR9-98MF] (providing both written and video instructions for creating reports).

[16]     However, it is well settled that the erroneous admission of evidence may be harmless error. As our Supreme Court has made clear:

> When an appellate court must determine whether a non-constitutional error is harmless, [Indiana Appellate] Rule 66(A)'s "probable impact test" controls. Under this test, the party seeking relief bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below. Importantly, this is not a review for the sufficiency of the remaining evidence; it is a review of what was presented to the trier of fact compared to what should have been presented. And when conducting that review, we consider the likely impact of the improperly admitted or excluded evidence on a reasonable, average jury in light of all the evidence in the case. Ultimately, the error's probable impact is sufficiently minor when—considering the entire record—our confidence in the outcome is not undermined.

*Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023) (citations omitted). Applying that test here, we are confident that the erroneous admission of State's Exhibit 26 had no impact on the trial court's judgment against Polk. Accordingly, the trial court's erroneous admission of that evidence is not reversible error.

## 2. The State presented sufficient evidence to support Polk's convictions.

[17]     We thus consider Polk's argument on appeal that the State failed to present sufficient evidence to support his two Level 1 felony convictions. For challenges to the sufficiency of the evidence, we consider only the probative evidence and the reasonable inferences therefrom that support the judgment of the trier of fact. *Hall v. State*, 177 N.E.3d 1183, 1191 (Ind. 2021). We will neither reweigh

the evidence nor judge witness credibility. *Id.* We will affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.*

[18] To prove that Polk committed Level 1 felony dealing in a controlled substance, the State was required to show that Polk knowingly or intentionally delivered a controlled substance, fentanyl, that, when used, resulted in the deaths of Roberto and Danilo. Ind. Code § 35-42-1-1.5(a) (2022). On appeal, Polk contends that the State did not sufficiently demonstrate that he delivered fentanyl to Roberto and his acquaintances. He also argues that the State did not show that it was reasonably foreseeable that any delivery to Roberto would have resulted in the death of another person.

[19] We disagree with Polk's assertion that the State failed to sufficiently demonstrate that he delivered fentanyl. The State's evidence demonstrates that Roberto and Polk engaged in a series of text messages in which Polk agreed to sell cocaine to Roberto on the night in question. The evidence demonstrates that Polk then visited a location near Roberto's residence. The evidence further demonstrates that Roberto engaged in no other communications for controlled substances and did not leave his residence during the time in question. Investigating officers at the scene testified that they observed a plate with a cocaine-appearing substance on it near a rolled up dollar bill and a credit card, which indicated use of apparent cocaine. And the officers testified that fentanyl is often mixed with cocaine by dealers to increase their profits. A reasonable fact-finder could conclude from that evidence that Polk knowingly or

intentionally delivered fentanyl to Roberto and his acquaintances during the evening hours of May 22, and Polk's argument to the contrary on appeal is simply a request for our Court to reweigh that evidence, which we will not do.

[20]   We also reject Polk's argument that the death of Danilo was not reasonably foreseeable. As we have explained:

> The concept of causation in criminal law is similar to that found in tort law. Like in tort law, the criminal act must be both 1) the actual cause (sometimes called the "cause-in-fact"); and 2) the legal cause (sometimes called the "proximate cause") of the result. Cause-in-fact requires that "but for" the antecedent conduct, the result would not have occurred. If there is more than one cause which precipitates the result, the defendant's action is the cause-in-fact if it is a "substantial factor" in bringing about that result.
>
> Legal or proximate cause is a distinct concept, speaking not to the physical relationship between the actor's conduct and the result[] but instead embodying a value judgment as to the extent of the physical consequences of an action for which the actor should be held responsible. Thus, proximate cause questions are often couched in terms of "foreseeability"; an actor is not held responsible for consequences which are unforeseeable. In Indiana, a result is deemed foreseeable if it is a "natural and probable consequence" of the act of the defendant.

*Bowman v. State*, 564 N.E.2d 309, 313 (Ind. Ct. App. 1990) (citation modified), *summarily aff'd in relevant part*, 577 N.E.2d 569, 571 (Ind. 1991).

[21]   Polk argues that the State did not demonstrate that Danilo was present when Polk was alleged to have delivered the fentanyl to Roberto. He also argues that

the State did not present sufficient evidence to show that he delivered an amount of fentanyl sufficient to result in the overdose deaths of multiple people, and Roberto's decision to share any of the fentanyl with third parties was a break in the chain of causation, requiring us to vacate his convictions.

Polk is mistaken. The last text message Roberto sent to Polk prior to Polk's delivery of the fentanyl made clear that Roberto and others were anxious to obtain the purported cocaine. That text message stated that "*we* want it now." Ex. Vol. p. 51 (emphasis added). Accordingly, it was reasonably foreseeable that the fentanyl Polk delivered to Roberto was going to be used by persons other than Roberto. Further, and again, the State's evidence made clear that Roberto had not engaged others that evening in purchasing controlled substances; that he had not left his residence during the times in question; and that the scene of drug use inside the home was consistent with the usage of apparent cocaine. And the State's evidence made clear that the ingestion of the fentanyl contributed to the death of both Roberto and Danilo. Polk's arguments on this issue again simply seek to have our Court reweigh the evidence, which we will not do. We conclude that the State presented sufficient evidence to support Polk's convictions.

## Conclusion

For all of these reasons, we affirm Polk's convictions and his adjudication as a habitual offender.

Affirmed.

Bradford, J., concurs.
May, J., concurs in result with separate opinion.

ATTORNEY FOR APPELLANT

Joshua C. Vincent
Marion County Public Defender Agency
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Daylon L. Welliver
Deputy Attorney General
Indianapolis, Indiana

**May, Judge, concurring in result.**

[25] I concur in the result affirming Polk's convictions, but I respectfully disagree with the majority's conclusion that the trial court erred by admitting State's Exhibit 26, the flash drive containing the entirety of Roberto's cell phone data. In my view, the trial court, in this bench trial, correctly admitted the complete phone data for authentication purposes.

[26] When the State moved to admit Exhibit 26, Polk objected on the ground that "99 percent" of the data was irrelevant. (Tr. Vol. 2 at 165.) The State responded: "I'm not asking to publish, Judge. This is just a foundation for the specific exhibits that are relevant that we would publish." (*Id.*) The trial court overruled Polk's objection subject to Exhibit 26 being connected to additional evidence presented by the State. Officer Roell then testified that he had extracted data from Exhibit 26 to generate the data-specific exhibits, Exhibits 27, 28, and 29, which were reports of text communications between Roberto's phone and Polk's phone, and Exhibit 43, Roberto's cell phone location data. After Officer Roell finished testifying, the parties further discussed Exhibit 26:

> [Polk]: . . . And just to clarify, on the phone dump that was provided, that's probably not even .1 percent of all the data that's on the dump that the State introduced. So again, I would ask that nothing else that was mentioned be - -
>
> THE COURT: Yeah, I'm only - - I mean, I'm not going fishing in the flash drive, so - -

[State]: Your Honor, the point for doing the entire phone dump was to ensure for the record the - -

THE COURT: Right.

[State]: - - authenticity of those subsequent exhibits.

THE COURT: I understand.

(*Id.* at 173-74.)

The majority concludes Officer Roell's testimony alone was sufficient to authenticate the data-specific exhibits. The majority asserts Exhibit 26 "simply added voluminous surplusage to the record that was unreasonable and unnecessary" and concludes the trial court "erroneously admitted" it. *Slip op.* at 7. However, given how the evidence was handled, I disagree. Polk was tried in a bench trial, and in criminal bench trials, we presume the trial court disregards inadmissible evidence and renders its decision solely based on relevant and probative evidence. *Tibbs v. State*, 996 N.E.2d 1288, 1290 (Ind. Ct. App. 2013), *trans. denied*. Indiana Rule of Evidence 901(a) requires the proponent of an exhibit to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." In demonstrating the authenticity of the data-specific exhibits, the State desired to present the source data from which the data-specific exhibits were extracted. The context surrounding specific communications is often necessary to prove the authenticity of the specific communications. *See, e.g.*, *Pavlovich v. State*, 6 N.E.3d 969, 979 (Ind. Ct. App.

2014) (holding circumstantial evidence sufficiently authenticated texts and email messages from the defendant), *trans. denied*; *Wilson v. State*, 30 N.E.3d 1264, 1269 (Ind. Ct. App. 2015) (holding witness testimony and content posted on social media account was sufficient to authenticate the defendant as the author of social media posts), *trans. denied*. The State expressly stated that it did not wish to publish Exhibit 26, and the trial court acknowledged the exhibit was only being admitted for the purpose of foundational authentication and not for substantive consideration. The State separately moved to admit and publish the data-specific exhibits, and Polk acknowledges "[t]he record does not indicate, and Polk does not allege, that the trial court reviewed any evidence from Exhibit 26 other than the [data-specific exhibits] separately admitted by the State." (Appellant's Br. at 19-20.) I understand the concern that, with voluminous electronic data, irrelevant or prejudicial portions may improperly reach a trier of fact, and were this a jury trial, I suspect the trial court would have exercised its gatekeeping function under Indiana Rule of Evidence 403[4] to keep such information from being considered by the jury. For these reasons, I conclude the trial court correctly admitted State's Exhibit 26. Because I agree with the majority's resolution of Polk's remaining arguments, I concur in the result affirming his convictions.

---

[4] Rule of Evidence 403 states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."